## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LOUISIANA MUNICIPAL POLICE EMPLOYEES RETIREMENT SYSTEM, Derivatively on Behalf of BANK OF AMERICA CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>KENNETH D. LEWIS, CHARLES K. GIFFORD, WILLIAM BARNET, III, FRANK P. BRAMBLE, SR., JOHN T. COLLINS, GARY L. COUNTRY-MAN, TOMMY R. FRANKS, MONICA C. LOZANO, WALTER E. MASSEY, THOMAS J. MAY, PATRICIA E. MITCHELL, THOMAS M. RYAN, O. TEMPLE SLOAN, MEREDITH R. SPANGLER, ROBERT L. TILLMAN, JACKIE M. WARD, JOE L. PRICE, AMY WOODS BRINKLEY, BRIAN T. MOYNIHAN, R. EUGENE TAYLOR, NEIL A. COTTY, KEITH T. BANKS, JOHN A. THAIN, CAROL T. CHRIST, ARMANDO M. CODINA, JUDITH MAYHEW JONAS, VIRGIS W. COLBERT, AULANA L. PETERS, CHARLES O. ROSSOTTI, JOHN D. FINNEGAN, JOSEPH W. PRUEHER, ANN N. REESE, NELSON CHAI, THOMAS K. MONTAG, DELOITTE & TOUCHE LLP, FOX-PITT KELTON COCHRAN CARONIA WALLER (USA) LLC, and J.C. FLOWERS & CO. LLC,<br><br>Defendants,<br><br>and<br><br>BANK OF AMERICA CORPORATION,<br><br>Nominal Defendant. | No. 09-cv-808 (UA)<br><br>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTIES, AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES, UNJUST ENRICHMENT, CONTRIBUTION, AND VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934<br><br>**JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff, by its undersigned attorneys, submits this Verified Shareholder Derivative Complaint ("Complaint") in the name and on behalf of nominal defendant Bank of America Corporation ("BOA" or the "Parent") against certain directors and officers of BOA named herein (the "BOA Defendants") and other defendants (collectively, "Defendants"). Plaintiffs base their allegations on actual knowledge as to their own acts and on information and belief as to all other allegations after due investigation.

## INTRODUCTION

1.      This action arises from the BOA Defendants' misconduct in manipulating the market for auction rate securities ("ARS"), leading to billions of dollars in losses and liabilities at the company. In addition, the action seeks relief for all Defendants' wrongdoing in causing BOA to acquire Merrill Lynch & Co., Inc. ("Merrill") in a merger transaction announced on September 15, 2008 and consummated on January 1, 2009 (the "Merger") that will cause untold billions more in losses and liabilities to BOA. The Merger was undertaken through a breach of the BOA Defendants' fiduciary duties to the company and its shareholders, aided and abetted by certain officers and directors of Merrill (the "Merrill Defendants"). The Merger was consummated through a false a misleading proxy statement issued by the Board of Directors of BOA (the "BOA Director Defendants") and others.

2.      BOA is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses, and large corporations with a full range of banking, investing, asset management, and other financial and risk-management products and services. The company depends for its success on the identity of its brand – and its reputation for honesty and integrity.

## The ARS Scam

3.      Today, through the misconduct of the BOA Defendants, BOA's reputation lies in tatters, and its future as a going concern is highly questionable.  The BOA Defendants – as well as their counterparts at approximately one dozen other brokerage houses, including Citigroup, UBS, and Morgan Stanley – participated in an industry-wide scheme in the ARS market whereby retail and institutional customers alike were induce to purchase tens of billions of dollars' worth of highly illiquid and unmarketable securities.  The scam will take years to recover from and cost BOA alone upwards of one billion dollars in fines, remediations, judgments, settlements, repurchases from customers, lost business, and other repercussions.

4.      Among the ways in which the BOA Defendants carried out the scheme were:

(a)      Deceptively marketing ARS to customers as highly liquid cash alternatives when, in fact, the ARS market in 2007 had become anything but liquid;

(b)      Failing to disclose that, starting in 2007, the ARS market was only "liquid" to the extent that these defendants caused or allowed the company to *create* an artificial market for ARS;

(c)      Failing to implement or maintain adequate internal controls to ensure that BOA's transactions in ARS were legal, honest, and fair to customers;

(d)      Co-opting the company's own supposedly independent research department into the cause of selling illiquid ARS to unsuspecting customers, employing various practices of undue influence that violated federal law, industry standards, and the company's own policies and procedures; and

(e)     Abruptly abandoning the ARS market in February 2008 after promising investors and the public to support it, leaving those investors stranded with illiquid and unmarketable securities;

5.     As a result of these defendants' misconduct, BOA became a target of an administrative proceeding relating to ARS by the Securities and Exchange Commission ("SEC") in 2006 – and again in 2008, for the same misconduct.  The company was investigated by the Massachusetts Securities Division and the New York Office of Attorney General, as well as a nine-state task force, comprising Florida, Georgia, Illinois, Missouri, New Hampshire, New Jersey, North Carolina, Texas and Washington, led by the Financial Industry Regulatory Authority and the North American Securities Administrators Association.   In addition, the company has been sued for violations of the federal securities laws arising out of the ARS scheme

6.     To head off those proceedings, the BOA Defendants agreed to several onerous settlements, including settlements in August and September 2008 that required BOA to pay a fine of $50,000,000 and repurchase approximately ***$5 billion*** worth of ARS from customers.  The ARS that BOA has acquired and will acquire from its customers in this way are substantially unmarketable and will require the company to book losses in the hundreds of millions, or billions, of dollars.

## The Citigroup Complaint

7.     The SEC recently filed a civil complaint against another participant in the ARS market manipulation scheme, Citigroup Global Markets, Inc. ("Citigroup").  The complaint against Citigroup was filed simultaneously with the SEC's announcement that a settlement with Citigroup was now finalized.  The SEC had reached a preliminary settlement with Citigroup in the late summer of 2008, just as it had with BOA.  (A copy of the SEC complaint is attached hereto as Exhibit A.)

8.     The complaint in the SEC civil action against Citigroup is based on misconduct similar or identical to that alleged here of the BOA Defendants in the ARS market.  *See* Exhibit A. Specifically, the SEC alleges that Citigroup knowingly concealed from its customers the growing illiquidity in the ARS market while simultaneously assuring them that ARS were safe and liquid investments.  *See* Exhibit A, ¶¶ 20-72.  Moreover, the SEC complaint alleges that no later than August 2007, as credit markets deteriorated, the true facts concerning the ARS market were made unmistakably clear to senior management.  *See id*. ¶¶ 32-34.  Finally, the SEC alleges that Citigroup nonetheless instructed its brokers to sell as much ARS inventory as possible, which would leave customers holding billions in illiquid securities.  *See id.* ¶¶ 40-54.

9.     The SEC complaint against Citigroup, with its identical allegations of misconduct to those here against the BOA Defendants, confirms why the misconduct at issue herein was not in any sense a new violation of the securities laws but was merely a resumption and exacerbation of the same pattern of misconduct that had led the SEC to fine and censure BOA in 2006.  *See* Exhibit A. Indeed, the SEC made clear in the Citigroup complaint that, among other things, although Citigroup had duly "posted its ARS practices on its website" pursuant to the 2006 settlement, "these disclosures were inadequate and did not negate Citi's marketing of ARS as liquid investments that were an alternative to money market instruments."  *Id.* ¶ 20.  The BOA Defendants, who agreed to the same settlement with the SEC in 2006, followed the exact same path afterward, as alleged herein.

## BOA Agrees to Buy Merrill Sight Unseen

10.     Merrill, for its part in the ARS scheme, entered into similar settlements with the SEC and state regulators, requiring Merrill to pay a fine of $125,000,000 and repurchase approximately $12 billion of ARS.  Shortly after entering into its ARS settlements, Merrill's liquidity problems, already serious, took an alarming turn for the worse, making clear that it could

not continue as a going concern.  The Board of Directors of Merrill and others at Merrill (sued here as the Merrill Defendants) were forced to sell the entire company to an outside party – which transaction these defendants accomplished on the weekend of September 13-14, 2008.  Thus was Merrill acquired by BOA in a stock-for-stock Merger announced on the morning of September 15, 2008.  The deal was negotiated in the space of a single afternoon, Saturday, September 13, 2008, between defendant Kenneth A. Lewis, BOA's Chairman and CEO, and defendant John A. Thain, the Chairman and CEO of Merrill.  The deal was valued at the time at approximately $50 billion, representing a 70 percent premium to the price of Merrill's common stock at the time.  The Boards of Directors of both Merrill and BOA approved the Merger in great haste in separate afternoon meetings held the next day.

11.     The approval of the Merger by the BOA Director Defendants constituted a flagrant breach of the Board members' fiduciary duties to BOA.  In agreeing to buy Merrill, the BOA Director Defendants were searching for a way to rectify the disaster that had been visited upon the company by the BOA Defendants in the ARS scheme.  Indeed, with the revenue pipeline from ARS and other derivative securities – which had represented a substantial percentage of BOA's revenues and profits in recent years – now transformed into outright liabilities, the BOA Director Defendants, led by Chairman Lewis, sought merger partners in an attempt to "buy their way out" of the problem – i.e., acquire purportedly profitable businesses, integrate them as subsidiaries, and use them to bolster the Parent's earnings.

12.     However, the process by which the BOA Director Defendants agreed to buy Merrill – and eventually close the deal on January 1, 2009 – was gravely flawed, from start to finish.

13.     First, the BOA Board conducted almost no due diligence of Merrill.  According to the BOA Director Defendants' own statements to shareholders, the due diligence they made of

Merrill began no earlier than the late afternoon of Saturday, September 13, 2008, and was essentially concluded by early the next morning.  Such an investigation, occupying as it did no more than 12 to 15 hours of analysis, was, on its face, woefully incomplete and inadequate for a proposed $50 billion merger.  The process was especially inadequate given Merrill's exposure to metastasizing losses in the market for ARS, collateralized debt obligations, mortgage-backed securities, and other derivatives that made headlines throughout the nation's economy in the summer and fall of 2008.

14.     Nowhere is this better illustrated than in the BOA Director Defendants' agreement to indemnify the officers and directors of Merrill (including the Merrill Defendants herein) for *all liabilities arising before the Merger was to be consummated.*  Pursuant to its terms, the Merger agreement required BOA to indemnify and exculpate all directors and officers of Merrill to the fullest extent provided by law, and it precluded BOA from amending, repealing, or in any way diminishing these indemnification and exculpation provisions for at least *six years* following the Merger.  This provision had the effect of completely transferring liability for all the Merrill Defendants' misconduct onto BOA, including liability for claims arising from the Merrill Defendants' own misconduct in the ARS market.

15.     In agreeing to these terms, the BOA Director Defendants did not consider the scope, potential amount, or any other aspect of the liabilities that they were causing BOA to assume – including whether the assumption of such liabilities might cause serious or even fatal harm to BOA.  The assumption of such liabilities without quantification or other consideration constituted a breach of these defendants' duties to BOA, since the decision to do so could not have been taken in good faith or as the result of those defendants' informed business judgment.  Through the BOA Director Defendants' misfeasance, BOA unwittingly inherited billions of dollars in losses and liabilities, eroding whatever value that Merrill had to BOA in the first place – and, once again, severely

jeopardizing BOA's ability to continue as a going concern.  Indeed, in a move which dismayed everyone but surprised no one, on or about January 16, 2009, BOA was forced to obtain an *additional* $20 billion in aid from the federal government (on top of approximately $25 billion in aid received in the fall of 2008), just to stay afloat.

## BOA Shareholders Get a False Picture of Merrill

16.     Moreover, as became obvious practically the moment it closed on January 1, 2009, the Merger was approved by BOA's shareholders based on inaccurate and misleading information furnished to them by certain of the Defendants.  The BOA Director Defendants sought shareholder consent to the Merger in a Schedule 14A Proxy Statement (the "Merger Proxy Statement") issued on November 3, 2008 – one month before the shareholder vote scheduled for December 5, 2008. The Merger Proxy Statement contained statements concerning Merrill that were false and that omitted information necessary to make the statements that were made not misleading.  Among other things, these defendants failed to disclose, either in the Merger Proxy Statement or subsequently, the unprecedented, and rapidly accelerating, losses at Merrill caused by its exposure to ARS and other derivative securities.

17.     That information, however, was at the BOA Director Defendants' fingertips, as they had obtained unfettered access to the entirety of Merrill's financial and accounting records once the Merger agreement was signed.  Merrill's exposure, totaling in the tens of billions of dollars, was manifestly material to BOA shareholders in deciding how to vote on the Merger.  By omitting to disclose this information, either in the Merger Proxy Statement itself or in a corrective or updated disclosure, and by choosing to emphasize the positive contribution Merrill would make to BOA, the BOA Director Defendants caused the Merger Proxy Statement to be false and misleading.  This

violated Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 promulgated thereunder.

### BOA Obtains a Secret Bailout

18.     The shareholder vote to approve the acquisition of Merrill was held on December 5, 2008, with 82 percent of BOA shareholders voting in favor.  Almost immediately after the votes were tallied, the BOA Director Defendants went to the United States Government to ask for more money – on top of the $25 billion BOA had already received – to enable BOA to complete the Merger.  Defendant Lewis, BOA's chairman, was expressly warned by both Treasury Secretary Henry Paulson and Federal Reserve Chairman Ben Bernanke not to try to back out of the Merger, even if it meant conceding that BOA's due diligence of Merrill had been faulty.  Lewis's mission was successful, and the BOA Director Defendants secured a promise of $20 billion in direct assistance to complete the Merger, as well as protections against $88.5 billion in additional exposure from Merrill.  These developments were not disclosed to BOA shareholders before it closed on January 1, 2009.

19.     The BOA Director Defendants' actions in determining that the Merger could not close without federal assistance, secretly securing that assistance, yet withholding these facts from shareholders while the Merger was still pending, constituted further breaches of these defendants' fiduciary duties.  If Merrill's exposure precluded BOA from being able to consummate the transaction, the BOA Director Defendants had a number of options by which they could have discharged their duties to shareholders.  One option was terminating the Merger under the "Material Adverse Effect" provisions of the Merger agreement.  Another option was renegotiating the terms of the Merger, including the purchase price, with Merrill.  Neither of these options was pursued, nor were shareholders given any information concerning the issue.  The BOA Director Defendants,

with over $100 billion in federal assistance dangling before their eyes, simply decided "not to rock the boat."

20.      The cost to BOA from the BOA Director Defendants' misconduct will be profound. Between January 14, 2009, when news first surfaced that the BOA Director Defendants had sought federal assistance to complete the Merger, and January 20, 2009, BOA's stock price dropped by 50 percent in only three trading days.  The market capitalization of BOA has fallen by approximately $90 billion since the deal with Merrill was first announced.  On January 16, 2009, BOA shocked the market in announcing a fourth-quarter loss of $1.79 billion, $15.3 billion of which was attributable to Merrill.  Thain, who had briefly run Merrill as a division of BOA, was fired.  Lewis has lost all credibility with investors and is expected to resign or be forced out.  The company will need tens of billions of dollars in new capital infusions, and there is talk of nationalization.  And BOA has still not reached a final settlement with the SEC for the ARS debacle.

**Theories of the Action**

21.      Plaintiffs seek derivative relief on behalf of BOA against the BOA Defendants for breach of fiduciary duty in manipulating the market for ARS at BOA; against the BOA Director Defendants for their breach of fiduciary duties in agreeing to indemnify the Merrill Defendants in the Merger; against the BOA Defendants' breach of fiduciary duties in agreeing to the Merger without adequate due diligence; against the BOA Defendants for their breach of fiduciary duties in proceeding with the Merger well after it had become apparent that Merrill would cause severe losses to BOA; and against the BOA Director Defendants, Price, the Merrill Defendants, and the Advisor Defendants in issuing a false and misleading Merger Proxy Statement in connection with obtaining shareholder approval of the Merger.  In addition, Plaintiff seeks relief against the Merrill Defendants

for aiding and abetting the BOA Director Defendants' fiduciary breaches in connection with the Merger.

22.     The action is based on the BOA Defendants' wrongful conduct in the ARS market during the period from January 1, 2007 to the present (the "Relevant Period"), and on all Defendants' misconduct in connection with the Merger.

## JURISDICTION AND VENUE

23.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331, because of claims presenting federal questions arising under the Exchange Act, and pursuant to 28 U.S.C. § 1367(a) because all others claims are so related to claims presenting federal questions that they form part of the same case or controversy.  This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332 in that, complete diversity exists between Plaintiff and each of the Defendants and the amount in controversy exceeds $75,000 exclusive of interests and costs.

24.     The Court has personal jurisdiction over each of the Defendants because each either is a corporation that conducts business in and maintains operations in this District or is an individual who either is present in New York for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because:  (a) one or more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## THE PARTIES

### Plaintiff

26.    Plaintiff Retirement System is an institution providing retirement and other benefits to municipal police personnel throughout the State of Louisiana.  The Retirement system has been a continuous owner of BOA stock throughout the Relevant Period and remains so today.  The Retirement System is an instrumentality of the State of Louisiana and a citizen thereof.

### Nominal Defendant

27.    Nominal defendant BOA is one of the world's largest financial institutions, serving individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management, and other financial and risk-management products and services.  BOA is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 100 North Tryon Street, Charlotte, North Carolina.

### The BOA Defendants

28.    Defendant Kenneth D. Lewis ("Lewis") is the Chairman, Chief Executive Officer and President of BOA.  He has been a director since 1999.  He became Chief Executive Officer in 2001 and has served continuously in that position since that time.  He became President in 2004 and has served continuously in that position since that time.  He became Chairman in 2005 and has served continuously in that position since that time.  He is also a member of the Executive Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to BOA, Lewis was paid $24,844,040 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007.   Lewis is a citizen of North Carolina.

29.    Defendant Charles K. Gifford ("Gifford") has been a member of the Board since 2004, when Bank of America acquired FleetBoston, of which Gifford was CEO.  He is a member of

11

the Executive Committee of the Board and was the Chairman of the Board until replaced by Lewis. In exchange for his purported trust, loyalty, and fidelity to BOA, Gifford was paid $1,383,648 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and 1,850,331 in 2007.  Gifford is a citizen of North Carolina.

30.      Defendant William Barnet, III ("Barnet") has been a member of the Board since 2004, when Bank of America acquired FleetBoston.  He is a member of the Audit Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to BOA, Barnet was paid $397,847 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $240,000 in 2007.  Barnet is a citizen of South Carolina.

31.      Defendant Frank P. Bramble, Sr. ("Bramble") has been a member of the Board since 2006, when BOA acquired MBNA.  He is a member of the Asset Quality Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to BOA, Bramble was paid $324,861 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $210,517 in 2007.  Bramble is a citizen of Delaware.

32.      Defendant John T. Collins ("Collins") has been a member of the Board since 2004, when Bank of America acquired FleetBoston.  He is a member of the Audit Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to BOA, Collins was paid $244,500 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $240,000 in 2007.  Collins is a citizen of Massachusetts.

33.      Defendant Gary L. Countryman ("Countryman") has been a member of the Board since 2004, when Bank of America acquired FleetBoston.  He is a member of the Executive Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to BOA,

Countryman was paid $403,145 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $210,517 in 2007.  Countryman is a citizen of Massachusetts.

34.     Defendant Tommy R. Franks ("Franks") has been a member of the Board since 2006.  He is a member of the Audit Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to BOA, Franks was paid $318,984 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $210,517 in 2007.  Franks is a citizen of Oklahoma.

35.     Defendant Monica C. Lozano ("Lozano") has been a member of the Board since 2006.  She is a member of the Asset Quality Committee of the Board.  In exchange for her purported trust, loyalty, and fidelity to BOA, Lozano was paid $263,486 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $210,517 in 2007.  Lozano is a citizen of California.

36.     Defendant Walter E. Massey ("Massey") has been a member of the Board since 1998.  He is a member of the Audit Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to BOA, Massey was paid $649,692 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $210,517 in 2007.  Massey is a citizen of Georgia.

37.     Defendant Thomas J. May ("May") has been a member of the Board since 2004, when Bank of America acquired FleetBoston.  He is the Chair of the Audit Committee of the Board. In exchange for his purported trust, loyalty, and fidelity to BOA, May was paid $469,117 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $240,517 in 2007. May is a citizen of Massachusetts.

38.    Defendant Patricia E. Mitchell ("Mitchell") has been a member of the Board since 2001.  She is a member of the Compensation and Benefits Committee and the Corporate Governance Committee of the Board.  In exchange for her purported trust, loyalty, and fidelity to BOA, Mitchell was paid $415,558 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $210,517 in 2007.  Mitchell is a citizen of New York.

39.    Defendant Thomas M. Ryan ("Ryan") has been a member of the Board since 2004, when Bank of America acquired FleetBoston.  He is a member of the Compensation and Benefits Committee and the Chair of the Corporate Governance Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to BOA, Ryan was paid $432,890 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $230,517 in 2007.  Ryan is a citizen of Rhode Island.

40.    Defendant O. Temple Sloan ("Sloan") has been a member of the Board since 1996. He is the "Lead Director" of the Board, Chair of the Compensation and Benefits Committee, a member of the Corporate Governance Committee, and Chair of the Executive Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to BOA, Sloan was paid $318,125 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $290,000 in 2007.  Sloan is a citizen of North Carolina.

41.    Defendant Meredith R. Spangler ("Spangler") has been a member of the Board since 1988.  She and her family own over 32,000,000 shares of BOA common stock – approximately eight times as much as Lewis and 16 times as much as any other Board member.  She is a member of the Compensation and Benefits Committee and the Corporate Governance Committee of the Board.  In exchange for her purported trust, loyalty, and fidelity to BOA, Spangler was paid $942,774 in

salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $210,517 in 2007.   Spangler is a citizen of North Carolina.

42.     Defendant Robert L. Tillman ("Tillman") has been a member of the Board since 2005.  He is a member of the Asset Quality Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to BOA, Tillman was paid $317,479 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $210,517 in 2007.  Tillman is a citizen of North Carolina.

43.     Defendant Jackie M. Ward ("Ward") has been a member of the Board since 1994. She is Chair of the Asset Quality Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to BOA, Ward was paid $982,528 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2006, and $230,517 in 2007.  Ward also serves as a director of at least five other corporations:  Equifax, Inc., Flowers Foods, Inc., Sanmina-SCI Corporation, SYSCO Corporation and Wellpoint, Inc.  Ward is a citizen of Georgia.

44.     Defendant Joe L. Price ("Price") is the Chief Financial Officer of BOA.   In exchange for his purported trust, loyalty, and fidelity to BOA, Joe Price was paid $6,486,717 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007.   Price is a citizen of North Carolina.

45.     Defendant Amy Woods Brinkley ("Brinkley") is the Global Risk Executive of BOA, in charge of controlling the company's credit, market, and operational risks.  In exchange for her purported trust, loyalty, and fidelity to BOA, Brinkley was paid $9,335,362 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007.  Brinkley is a citizen of North Carolina.

46.     Defendant Brian T. Moynihan ("Moynihan") is the head of BOA's Global Banking and Global Wealth and Investment Management unit, the most senior position associated with Merrill's operations at BOA.  Moynihan replaced Thain in this position when Thain resigned on January 22, 2009.  Previously, Moynihan was the President of Global Corporate and Investment Banking of BOA, and its General Counsel.  He is a former high-ranking officer of FleetBoston, which BOA acquired in 2004.  In exchange for his purported trust, loyalty, and fidelity to BOA, Moynihan was paid $10,104,274 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007.  Moynihan is a citizen of North Carolina.

47.     Defendant R. Eugene Taylor ("Taylor") is the Former Vice Chairman and Former President, Global Corporate and Investment Banking of BOA.  He retired on December 31, 2007.  In exchange for his purported trust, loyalty, and fidelity to BOA, Taylor was paid $13,298,247 in salaries, bonuses, fees, stock options, stock awards, and other compensation in 2007.  Taylor is a citizen of North Carolina.

48.     Defendant Neil A. Cotty ("Cotty") is the Chief Accounting Officer of BOA.  Cotty is a citizen of North Carolina.

49.     Defendant Keith T. Banks ("Banks") is the President, Global Wealth and Investment Management of BOA.  He was a high-ranking officer of FleetBoston, which BOA acquired in 2004.  Cotty is a citizen of North Carolina.

**The Merrill Defendants**

50.     Defendant John A. Thain ("Thain") was the Chief Executive Officer of Merrill and Chairman of the Merrill Board from 2007 to January 1, 2009.  Thain became the President of Global Banking, Securities and Wealth Management of BOA on January 1, 2009 but resigned in scandal on January 22, 2009, following reports of massive losses and wasteful practices at Merrill.  In exchange

16

for his purported trust, loyalty, and fidelity to Merrill, Thain in 2007 was paid over $17,300,000 in salaries, bonuses, fees, stock options, stock awards, and other compensation.  Between January 1, 2007 and December 31, 2008, Thain, based upon his knowledge of material, non-public information about the company, sold over $795,434 worth of Merrill stock.  Thain is a citizen of New York.

51.     Defendant Carol T. Christ ("Christ") was a member of the Merrill Board from 2007 until January 1, 2009.  She was a member of the Public Policy and Responsibility Committee of the Board.  In exchange for her purported trust, loyalty, and fidelity to Merrill, Christ in 2007 was paid over $191,000 in fees, stock awards, and other compensation.  Christ is a citizen of Massachusetts.

52.     Defendant Armando M. Codina ("Codina") was a member of the Merrill Board from 2005 until January 1, 2009.  He was Chair of the Nominating and Corporate Governance Committee of the Board, and a member of the Management Development and Compensation Committee.  In exchange for his purported trust, loyalty, and fidelity to Merrill, Codina in 2007 was paid over $270,000 in fees, stock awards, and other compensation.  Codina is a citizen of Florida.

53.     Defendant Judith Mayhew Jonas ("Jonas") was a member of the Merrill Board from 2006 until January 1, 2009.  She was a member of the Public Policy and Responsibility Committee and the Audit Committee of the Board.  In exchange for her purported trust, loyalty, and fidelity to Merrill, Jonas in 2007 was paid over $275,000 in fees, stock awards, and other compensation.  Jonas is a citizen of the United Kingdom.

54.     Defendant Virgis W. Colbert ("Colbert") was a member of the Merrill Board from 2006 until January 1, 2009.  He was a member of the Public Policy and Responsibility Committee, the Nominating and Corporate Governance Committee, and the Management Development and Compensation Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to

17

Merrill, Colbert in 2007 was paid over $261,000 in fees, stock awards, and other compensation. Colbert is a citizen of Wisconsin.

55.     Defendant Aulana L. Peters ("Peters") was a member of the Merrill Board from 1994 until January 1, 2009.  She was a member of the Public Policy and Responsibility Committee and the Management Development and Compensation Committee of the Board.  In exchange for her purported trust, loyalty, and fidelity to Merrill, Peters in 2007 was paid over $270,000 in fees, stock awards, and other compensation.  Peters is a citizen of California.

56.     Defendant Charles O. Rossotti ("Rossotti") was a member of the Merrill Board from 2004 until January 1, 2009.  He was Chairman of the Finance Committee and a member of the Audit Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to Merrill, Rossotti in 2007 was paid over $274,000 in fees, stock awards, and other compensation.  Rossotti is a citizen of Maryland.

57.     Defendant John D. Finnegan ("Finnegan") was a member of the Merrill Board from 2004 until January 1, 2009.  He was Chair of the Management Development and Compensation Committee, and a member of the Finance Committee and the Nominating and Corporate Governance Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to Merrill, Finnegan in 2007 was paid over $282,000 in fees, stock awards, and other compensation.  Finnegan is a citizen of New Jersey.

58.     Defendant Joseph W. Prueher ("Prueher") was a member of the Merrill Board from 2001 until January 1, 2009.  He was Chair of the Public Policy and Responsibility Committee and a member of the Audit Committee of the Board.  In exchange for his purported trust, loyalty, and fidelity to Merrill, Prueher in 2007 was paid over $278,000 in fees, stock awards, and other compensation.  Prueher is a citizen of Virginia.

59.     Defendant Ann N. Reese ("Reese") was a member of the Merrill Board from 2004 until January 1, 2009.  She was Chair of the Audit Committee and a member of the Finance Committee of the Board.  In exchange for her purported trust, loyalty, and fidelity to Merrill, Reese in 2007 was paid over $277,000 in fees, stock awards, and other compensation.  Reese is a citizen of New York.

60.     Defendant Nelson Chai ("Chai") was the Executive Vice President and Chief Financial Officer of Merrill at all relevant times.  Chai is a citizen of New York.

**The Advisor Defendants**

61.     Defendant Deloitte & Touche LLP ("Deloitte") is an independent registered public accounting firm that advises Merrill on a regular basis.  Deloitte is a limited liability partnership organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

62.     Defendant Fox-Pitt Kelton Cochran Caronia Waller (USA) LLC ("FPK") is a leading global specialist investment bank focused on the financial services industry.  FPK is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

63.     Defendant J.C. Flowers & Co. LLC ("J.C. Flowers") is a principal investment firm specializing in buyouts which sometimes serves as a financial advisor to companies in the banking and financial services industries.  J.C. Flowers is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in New York, New York.

**Definitions of Groups**

64.     The "Merrill Defendants" comprise those defendants named in paragraphs 50-60 hereof.

65.     The "BOA Defendants" comprise those defendants named in paragraphs 28-49 hereof.

66.     The "BOA Director Defendants" (sometimes referred to herein as the "BOA Board") comprise those persons serve on the BOA Board named in paragraphs 28-43 hereof.

67.     The "BOA Officer Defendants" comprise those defendants who served as officers of Merrill during the events complained of named in paragraphs 28 and 44-49 hereof.

68.     The "Advisor Defendants" comprise those defendants named in paragraphs 61-63 hereof.

**I.      SUBSTANTIVE ALLEGATIONS APPLICABLE TO THE BOA DEFENDANTS CONCERNING AUCTION RATE SECURITIES.**

**A.      DESCRIPTION OF BOA'S ARS BUSINESS.**

69.     BOA's Global Corporate and Investment Banking Group ("GCIB"), also known as Banc of America Securities, LLC, provides mergers and acquisitions advisory, underwriting, capital markets, as well as sales and trading in fixed income and equities markets.  The ARS issued, sold, and marketed by BOA were all transacted within the GCIB group.

**B.      THE ARS MARKET.**

70.     ARS are securities which have no fixed rates of return, but whose rates of return are periodically re-set – typically every 7, 14, 28, or 35 days, but in some cases even daily – by an auction process.  ARS are usually issued with maturities of 30 years, but the maturities can range from five years to perpetuity.

71.     First developed in 1984, by 2008 the market for ARS had grown to well over $300 billion annually.  Traditionally, the market was limited to institutional investors, but the minimum investment in ARS was reduced to $25,000, placing these securities within the reach of individual investors.

72.     ARS are auctioned at the "par" value – i.e., a specific dollar amount worth of securities.  The pricing variable consists of the interest rate or dividend yield that the auction process determines.  The rate or yield on any ARS is supposed to be set by a "Dutch" auction in which bids with successively higher rates are accepted until all of the securities in a particular auction are sold.

73.     Investors typically can submit only the following types of orders:

(a)     a "hold" order, which is the default order for current investors (i.e., the order that is entered for a current holder if the holder takes no action), where a current investor will keep the securities at the rate at which the auction clears;

(b)     a "hold-at-rate" bid, where a current investor will only keep the securities if the clearing rate is at or above the specified rate;

(c)     a "sell" order, where a current investor will sell the securities regardless of the clearing rate; or

(d)     a "buy" bid, where a prospective investor (or current investor who desires additional securities) will buy securities if the clearing rate is at or above the specified rate.

74.     As stated by disclosure documents (such as prospectuses) issued with respect to each ARS, an investor's order is irrevocable.  The final rate at which all of the securities are sold is the "clearing rate" that applies to all of the securities in the series until the next auction.  Bids with the

lowest rate and then successively higher bids are accepted until all of the sell orders are filled.  The clearing rate is the lowest rate bid sufficient to cover all of the securities for sale in the action.[1]

75.     If there are not enough bids to cover the securities for sale, then the auction fails, the issuer pays an above-market rate set by a pre-determined formula described in the disclosure documents, and all of the current holders continue to hold the securities, with some minor exceptions.  If all of the current holders of the security elect to hold their positions without bidding a particular rate, then the clearing rate, referred to as the "all-hold" rate, is a below-market rate set by a different formula.

76.     The issuer of each ARS selects one or more broker-dealers to underwrite the offering and/or manage the auction process.  Investors can only submit orders through the selected broker-dealers.  BOA was one of the largest broker-dealers participating in the ARS market.

77.     The issuer pays an annualized fee to each broker-dealer, such as BOA, engaged to manage an auction.  The fee is typically 25 basis points (i.e., 25% of 1%) for the par value of the securities managed by that broker-dealer.

78.     The issuer also selects an auction agent to collect the orders and determine the clearing rate for the auction.  Investors must submit orders for an auction to the broker-dealer by a specified deadline.  Many broker-dealers have an internal deadline by which investors must submit their orders to them.

---

[1] Here is a simplified example of such an auction.  Suppose $75,000 par value of securities were for sale and the auction received four buy bids.  Bid 1 was for $25,000 at 3.05%.  Bid 2 was for $25,000 at 3.10%.  Bid 3 was for $35,000 at 3.10%.  Bid 4 was for $20,000.  In these circumstances, the "clearing rate" would be 3.10%, meaning all of the securities in the series would pay an interest rate (or yield, as the case may be) of 3.10% until the next auction.  Bid 1 would be allocated $25,000.  Bids 2 and 3 would receive pro-rata allocations of the remaining $50,000 worth of securities in proportion to the ratio of the par value bid for in each to the total par value bid for in both.  Bid 4 would receive nothing.

79.     This internal deadline allows the broker-dealer sufficient time to process and submit the orders to the auction agent.  Other broker-dealers allow investors to submit orders up to the submission deadline, i.e., the deadline for all broker-dealers to submit orders to the auction agent. The broker-dealers must submit the orders to the auction agent before the submission deadline, and usually must identify each separate order.

80.     After receiving the orders from the broker-dealers, the auction agent calculates the clearing rate that will apply until the next auction.  If there is only one broker-dealer, however, as was the case in many of the auctions managed by BOA, the broker-dealer can discern the clearing rate before submitting orders to the auction agent.

81.     The auction agent allocates the securities to the broker-dealers based on the orders they submitted.  The auction procedures generally state that orders are filled in the following order: hold orders, hold-at-rate and buy bids with a rate below the clearing rate, hold-at-rate orders with a rate at the clearing rate, and buy bids with a rate at the clearing rate.

82.     When there are more bids for securities at the clearing rate than securities remaining for sale, the securities are allocated on a pro rata basis first to the hold-at-rate bidders and then to the buy bidders.  Generally, the auction procedures require broker-dealers to follow the same hierarchy in allocating the securities to their customers.

**C.    "RED FLAGS" PUT THE BOA DEFENDANTS
ON NOTICE OF CONTROL DEFICIENCIES AND
IMPROPER PRACTICES IN THE ARS MARKET.**

83.     From 1984 to 2006, the ARS market had grown to more than $200 billion annually, and the fees collected by the ten or so broker-dealers who dominated the market exceeded $600 million annually.

84.     The success of the ARS market at BOA – on which the BOA Defendants' reputations and bonuses were based – depended on the perception that the market was extremely liquid.  This is because the primary target customers for ARS are investors with short-term investment goals or cash-equivalent needs.  Any hint that the ARS market was not liquid had the potential to trigger a massive sell-off by investors flocking to safer, more stable securities.  A failed auction, or even the rumor of one, was a something that the BOA Defendants sought to avoid at all cost, even if it meant steering the company into an illegal course of action.

85.     In spite of this danger, in practice, the ARS auctions as a whole were not nearly liquid enough to support the billions of dollars' worth of these securities that broker-dealers such as the BOA Defendants had caused or allowed the company to market to investors on a daily basis.

86.     Beginning in 2007, tightening credit sharply reduced the numbers of purchasers of ARS, resulting in there being an inadequate number of purchasers to support the auctions.  Against this backdrop, the BOA Defendants – to continue selling the company's inventory of ARS, to protect the profits the company made on them, and to enhance their own positions and compensation – conspired to create the illusion that the ARS repurchase market was liquid and remained liquid.  Throughout 2007, these defendants caused or allowed BOA to engage in various practices designed to "support" the market, which they termed market "stabilization."  Moreover, these defendants labored to misrepresent ARS to customers as safe and liquid securities, knowing full well that the market was drying up, that the company's ability to support the market was doubtful, and that if it were to walk away from the market, customers would be left holding billions of dollars in illiquid securities.

87.     The BOA Defendants' conduct, however, was nothing short of the type of market manipulation scheme that the securities laws have, for generations, proscribed – a fact of which these defendants were well aware beginning no later than 2006.

88.     Indeed, in an administrative proceeding dated May 31, 2006, the SEC found that BOA and other broker-dealers had engaged in various illegal practices in order to make it appear that the auctions were successful and legitimate when, in fact, they were not.  These actions, and the SEC's findings, were the direct and foreseeable consequence of the BOA Defendants' having knowingly encouraged the practices in question.  The misconduct at issue in 2006 was a direct precursor of the BOA Defendants' conduct during the Relevant Period, involving manipulation of the market for ARS and failure to disclose the true facts concerning that market to customers.

89.     For example, broker-dealers such as BOA were found to have routinely taken over their customers' bid orders by filling in the blanks on open or market orders *after viewing other bidders' orders*.  This practice allowed BOA and other broker-dealers to bestow discounts on certain customers at the direct expense of other customers, and also allowed the broker-dealers to manipulate the clearing rate of the auction.

90.     In addition, broker-dealers could bid for their own accounts without disclosing this fact to customers, and the broker-dealers could ask their customers to change their orders, in both cases so as to allow the broker-dealer to:

      (a)     prevent auctions from failing, thereby supporting the broker-dealers claim that the ARS market was very liquid and no auction had ever failed for want of orders; and

      (b)     set artificial "market" rates, at levels essentially dictated solely by the broker-dealers themselves.

91.     The SEC also found that broker-dealers had rearranged bids through a process of "netting" of in-house buy and sell orders ahead of actual auctions in order to change the priority of bids.  Thus, before submitting bids to the auction agent, broker-dealers changed or "prioritized" their customers' bids to increase the likelihood that the bids would be filled.  As a result of this prioritization, as well as a similar practice known as "cross-trading," certain bids were secretly moved up in the disclosed hierarchy for the order in which bids of various types would be filled.  In many instances, these practices resulted in certain customers' bids displacing other customers' bids when the auction was oversubscribed, which falsely affected the clearing rate, and did not conform to the disclosed procedures.

92.     The SEC also found that BOA and other broker-dealers allowed the rampant submission or revision of bids after external and/or internal deadlines.  In addition, the broker-dealers themselves submitted or revised bids after these deadlines.  These practices favored investors or the broker-dealers who bid after a deadline by displacing other investors' bids, affected the clearing rate, and did not conform to the disclosed procedures.

93.     The SEC also found that broker-dealers such as BOA had collaborated with certain of their customers by asking them to bid at auctions and then compensating in the secondary market with rates that were higher than the clearing rate on the auction itself.  For example, certain broker-dealers persuaded customers to submit bids at lower rates than the customers actually wanted to receive, allowing the auction to clear at the lower rate, buying the securities from the investor after the auction at the clearing rate, and then selling the securities back to the investor at the same rate but below par value.  Some broker-dealers did not even trouble themselves to convince customers to submit a "straw man" bid and, instead, simply displaced those customers' bids and then sold them

securities at below par value in the secondary market.  Also, some broker-dealers provided higher returns to certain customers by delaying settlement dates for those customers.

94.      Finally, the SEC found that certain broker-dealers provided different "price talks"[2] to different customers, placing certain customers at an advantage over others at the expense of the others.

95.      The SEC's findings demonstrated that the BOA Defendants, and their counterparts at other broker-dealers, had caused or allowed ARS auctions to be auctions in name only and, in fact, were an illegal market made and manipulated by the broker-dealers themselves.  As a consequence of these practices, fifteen broker-dealers, including Merrill and BOA, were fined $13 million, censured by the SEC, and ordered to cease and desist from those practices.  In May 2006, BOA was sentenced to a civil penalty of $750,000.  The terms of the 2006 cease-and-desist order by the SEC were embodied in an SEC release, dated May 31, 2006, (the "2006 SEC Release") that was promptly made publicly available.  A true and correct copy of the 2006 SEC Release is attached hereto as Exhibit B.

96.      Another abuse in the ARS market at BOA was that the terms of ARS were structured in a manner that precluded secondary market value in the event of an auction failure.  Maximum rates, those interest rates that would be applied in the event of an auction failure, were set at low levels which were favorable to issuer clients of BOA but, in the case of broad auction failures, provided issuers with little or no incentive to seek alternative financing in order to redeem the ARS shares.

---

[2] Price talk is a broker-dealer's estimate of the likely range within which an auction will clear.

97.     The establishment of low maximum rates directly contributed to issuer clients' efforts in successfully obtaining AAA ratings for their securities from credit rating agencies.  And indeed, the BOA Defendants stressed the AAA ratings of the company's ARS in their marketing efforts, billing them as ultra conservative investments.  But when the BOA Defendants caused or allowed BOA to stop supporting its auctions, investors came to realize that the low maximum rate which had allowed the securities to receive an AAA rating rendering their holdings unmarketable and illiquid.

98.     On the investor side, interest rates were not high enough to compensate interested investors for their increased liquidity risk.  The BOA Defendants had no incentive to negotiate for higher maximum rates to balance the market interests, *because the company was collecting significant underwriting fees from issuers at the outset on the investment banking side.*  Thus, the BOA Defendants, by working the investment banking side, had a significant interest in keeping the company's issuer clients happy in order to maximize their own personal bonuses and other compensation.

99.     The BOA Defendants, by causing BOA to have a dual role in representing both issuers and investors purchasing ARS, created significant and inherent conflicts of interest.  These defendants did not adequately resolved these conflicts of interest but, instead, caused or allowed them to be intensified, placing the company in violation of its own standards, the standards applicable to the securities industry, and federal and state law.

100.    Despite the fines and cease-and-desist orders imposed by the SEC, the BOA Defendants knowingly caused or allowed the company to continue to engage in various practices, including those set forth above, to artificially bolster the auction markets, exposing itself to greatly enhanced criminal and civil liability.

101.    Indeed, despite their conscious awareness of the growing illiquidity in the ARS market, the BOA Defendants knowingly caused or allowed the company to sell ARS to unsuspecting customers without warning those customers of the risks.

### D.    AFTER 2007, THE BOA DEFENDANTS ABANDON THE ARS MARKET, AND IT COLLAPSES.

102.    In 2007, a credit crisis of unprecedented levels swept across the United States economy that continues to roil the nation's financial markets.

103.    By the middle of 2007, banks had stopped financing private equity deals, the prices of U.S. residential real estate had gone into a steep decline, and the mortgage market for sub prime borrowers had essentially shut down.   The collapse of the credit markets forced financial institutions such as BOA to report billions of dollars in losses and write-downs.   In addition, the credit crisis created significant balance sheet stress for BOA.   This balance sheet stress affected the company's ability to purchase additional assets, including ARS, because they would have had to use their capital resources for those purchases.   At the same time, the ARS market was deteriorating.   As BOA increasingly had to purchase ARS inventory to prevent failed auctions, the dollar amount of the company's inventory reached the internal balance sheet limits that were set for its ARS inventory.   This fact was well known to the BOA Defendants, who were in a position to, and did, closely monitor the company's revenues from ARS operations.

104.    As a consequence, the demand for ARS by BOA's corporate and institutional clients dried up.   This shift was driven, in large part, by a March 2007 decision by the Financial Accounting Standards Board requiring ARS to be listed on investors' balance sheets as "short-term investments" rather than "cash equivalents."   Corporate investors responded to this by disposing of their ARS so that their balance sheet cash positions would not be reduced as result of the FASB decision, and their

liquidity ratings would not suffer.  As a consequence, BOA was forced to retain more ARS inventory on its books than it could financially handle.

105.    Despite these developments, the BOA Defendants struggled to maintain the illusion of a healthy and liquid market for ARS to their customers.

106.    Thus, rather than disclose the weakening demand for ARS, these defendants caused or allowed the company to *market ARS to customers even more intensely as a liquid cash alternative*.  Indeed, these defendants caused such securities to be represented expressly as "money market and auction instruments" in monthly account statements to customers.

107.    These defendants engaged in this conduct, among other reasons, so that BOA could unload millions of dollars in ARS that the company had in its inventory to its own customers before those securities became unmarketable.

108.    By August 16, 2007, several monthly auctions had failed amidst the turmoil in the credit markets.  That month, investors did not show to bid for about 60 auctions worth $6 billion of ARS.  Also, some credit ratings agencies were advising that "they would not be surprised to see further failed auctions in the days or weeks ahead."

109.    Thereafter, auctions began failing with regularity, and those few that did succeed would have failed but for the intervention of BOA and the other broker-dealers themselves.  The BOA Defendants caused or allowed the company to continue to intervene so as to prop up the auction market by bidding with knowledge of other bids, by submitting bids after the internal bidding deadlines imposed on investors, and by directly or indirectly influencing or setting the clearing rates.  In short, despite their awareness that there was, in fact, no legitimate auction demand for ARS, these defendants continued to actively market and sell ARS as a liquid cash alternative,

exposing BOA to irremediable damage to its reputation and hundreds of millions of dollars in civil and criminal penalties.

110.    Then, after unloading as many ARS as they could onto unsuspecting customers, the BOA Defendants directed the company to stop supporting auctions altogether and simply "walk away" from the ARS market.

111.    Thus, on February 13, 2008, 87 percent of the auctions for ARS failed when the BOA Defendants, and their counterparts at other broker-dealers, stopped supporting the auctions. Thousands of investors, holding millions of dollars of ARS, were now left with highly illiquid and unmarketable securities.

### E.    WHILE REASSURING RETAIL ARS CUSTOMERS, THE BOA DEFENDANTS SECRETLY WARN LARGE ARS ISSUER CLIENTS OF TROUBLE IN THE ARS MARKET.

112.    The BOA Defendants worked aggressively throughout the Relevant Period to market ARS to unsuspecting BOA customers as safe and liquid securities.

113.    For example, as reported by the *Boston Globe* [June 17, 2008]:

Michael J. Martella of Deland, Fla., has $250,000 in auction-rate securities of student lenders in Texas and Kentucky.  A former broker himself, he says he was suspicious when his broker at Banc of America Investments Services, Inc. called last November, trying to persuade him to move out of money markets and into this different type of investment.  The broker assured him the bonds were "seven-day money," Martella said, meaning they traded weekly and were almost like cash.

Only later did Martella learn that this was student-loan debt.  Banc of America Securities was also investment banker to Texas and Kentucky lenders, assisting them with their debt offerings.

114.    Despite reassuring customers that the ARS market remained a vibrant and healthy one, the BOA Defendants were well aware that the market, in fact, was illiquid.  By no later than August 2007, ARS auctions had begun to fail, putting these defendants on notice of the inherent problems and abuses in the ARS market at BOA.

115.   The BOA Defendants deliberately deceived and abandoned BOA's retail ARS customers, offering soothing reassurances to these customers *while secretly warning the company's institutional ARS issuer clients of trouble in the ARS market*.

116.   For example, in a presentation to the Treasurer of the State of California on December 17, 2007, the BOA Defendants candidly confessed that there had been "significant dislocation" in the ARS market in the preceding three weeks.

117.   According to the *Boston Globe* [Aug. 19, 2008], the BOA Defendants then "went on to detail a drop in demand for the [ARS] bonds [and] said there had been 'significant year-end selling' of the investments, mainly by corporate clients.  Further, [the BOA Defendants] said there was 'significant uncertainty' about pricing for the [ARS] bonds for the next year."

118.   Heeding the BOA Defendants' warnings, the California Treasurer successfully refinanced all but $100 million of the $1.4 billion in ARS that California had issued through BOA. Michael J. Martella was not so lucky.

### F.   THE EFFECT OF THE BOA DEFENDANTS' MISCONDUCT EXPOSES BOA TO MASSIVE LOSSES AND LIABILITIES.

119.   As a result of the BOA Defendants' misconduct, BOA also has been subject to investigations by, and settlements with, federal and state securities regulators.

120.   The Massachusetts Securities Division issued subpoenas to BOA and other broker-dealers on or about March 28, 2008 in connection with the ARS market manipulation.

121.   On or about April 14, 2008, the New York Attorney General announced its own probe of the ARS market and issued subpoenas to BOA and other broker-dealers.

122.   On or about May 23, 2008, a securities class action, *Bondar v. Bank of America Corp.*, No. CV 08 2599 (N.D. Cal.), was commenced against BOA and certain officers in the Northern District of California relating to plaintiffs' purchases of ARS.  The *Bondar* action alleged,

among other things, that the defendants failed to disclose the following material facts about the ARS it sold to the putative class:  (1) ARS were not cash alternatives, like money market funds, but were instead, complex, long-term financial instruments with 30 year maturity dates, or longer; (2) ARS were only liquid at the time of sale because BOA and other broker-dealers were artificially supporting and manipulating the auction rate market to maintain the appearance of liquidity and stability; (3) BOA and other broker-dealers routinely intervened in auctions for their own benefit, to set rates and prevent all-hold auctions and failed auctions; and (4) BOA continued to market auction rate securities as liquid investments after it had determined that it and other broker dealers were likely to withdraw their support for the periodic auctions and that a "freeze" of the market for auction rate securities would result.

123.    On or about September 3, 2008, eight BOA officers were subpoenaed by the New York Attorney General.

124.    On September 10, 2008, the BOA Defendants settled the proceedings brought by Massachusetts, and on October 8, 2008, a preliminary settlement was reached in the proceedings brought by the SEC and the New York Attorney General.  To settle the proceedings, the BOA Defendants to onerous terms  that, among other things, required the company to pay a fine of $50,000,000, and to repurchase approximately $5,000,000,000 of ARS from customers over a period of time.  As of today's date, BOA has incurred losses of approximately $500 million on its repurchases of ARS, and the company is only part of the way done with that obligation.

125.    The BOA Defendants' actions have caused untold harm to BOA.  The company is exposed to hundreds of millions of dollars in losses, settlements, damages, and other liability that it would not otherwise have been exposed to had the BOA Defendants not engaged in the scheme.  In

addition, the company faces irremediable damages to its reputation from various investigations by state and federal agencies.

126.    Moreover, as demonstrated by the agreement with Massachusetts, any settlements can be expected to cover only BOA's retail clients – not large corporate customers who constituted the bulk of the company's ARS business.  For example, *Financial Week* [6/2/08] reported that some corporate investors in ARS backed by collateralized debt obligations would have to take huge charges, as those ARS had become, for all intents and purposes, worthless:

> Companies that held auction-rate paper backed by collateralized debt obligations, for example, had little hope of recovering their money and were more likely to take a charge. That happened at Bristol-Myers Squibb, whose ARS have a par value of $807 million. The company has taken $456 million in impairment charges, $300 million of which were permanent.

127.    Further, although the settlements require repurchases at par from the smaller investors, even those investors will have causes of action (e.g., for having had their assets frozen) against BOA, exposing it to millions of dollars in damages.  The BOA Defendants conceded this point in consenting to an arbitration procedure to determine consequential damages.  Further, the settlements do not extend to investors holding ARS through mutual funds or brokerage firms that did not themselves underwrite the debt (as did BOA).  These "downstream" purchasers – or the mutual funds or brokerage firms which directly bought the debt through BOA – will have additional claims against the company.  The amount of these private lawsuits will far exceed the amount of the company's settlements with a few state agencies.

II.   **SUBSTANTIVE ALLEGATIONS APPLICABLE TO THE BOA DIRECTOR DEFENDANTS IN APPROVING THE ACQUISITION OF MERRILL AND GOING FORWARD WITH THE DEAL WHEN IT BECAME CLEAR THAT MERRILL WOULD HAVE A POIONOUS EFFECT ON BOA, CONCEALING THAT FACT FROM SHAREHOLDERS.**

128.    The Merger was an immense financial undertaking for BOA.  Based on that company's market capitalization on the day before the Merger was announced, the cost of the Merrill acquisition was 27 percent of BOA's market capitalization.  In connection with the Merger, BOA committed to issue approximately 1.710 billion new shares of its common stock, and 359,100 shares of preferred stock.

A.   **THE BOA DIRECTOR DEFENDANTS CONDUCT INADEQUATE DUE DILIGENCE OF MERRILL AND AGREE TO INDEMNIFY THE MERRILL DEFENDANTS IN THE MERGER, THEREBY CAUSING BOA TO ASSUME UNTOLD LIABILITIES.**

129.    In causing BOA to grant complete indemnification to the Merrill Defendants for all possible pre-Merger claims, the BOA Director Defendants caused BOA to assume massive liabilities, set forth in Exhibit C hereto, that are material and have the potential to financially harm or destroy BOA.  The assumption of those liabilities by the BOA Director Defendants could not have been the product of an exercise of business judgment, and thus the BOA Director Defendants are liable to BOA for having done so.

130.    The BOA Director Defendants' own description of the decision to acquire Merrill for BOA establishes that these defendants, in approving the Merger, devoted insufficient process, relied upon insufficient due diligence, and conducted insufficient deliberation.

131.    According to the Schedule 14A Proxy Statement dated October 31, 2008 which the BOA Director Defendants filed with the SEC and made publicly available on November 3, 2008, (the "Merger Proxy Statement") the BOA Board considered, and approved, the Merger in the space of *a single afternoon* (Sunday, September 14, 2008).

132.     The BOA Director Defendants provided the following as the sum total of the

deliberation they gave to the Merger:

> In the late afternoon on Sunday [September 14, 2008], the Bank of
> America board of directors met with members of Bank of America
> senior management and its outside advisors.  Bank of America senior
> management reviewed with the Bank of America board of directors
> information regarding Bank of America, Merrill Lynch and the terms
> of the proposed transaction.  Bank of America senior management
> and the company's financial advisors, J.C. Flowers and FPK,
> presented the Bank of America board of directors with the findings of
> their due diligence investigation of Merrill Lynch and additional
> information, including financial information regarding the two
> companies and the transaction as more fully described below under
> the heading "— Opinion of Bank of America's Financial Advisors".
> Each of J.C. Flowers and FPK orally advised the Bank of America
> board of directors, and indicated that it was prepared to render a
> written opinion to the same effect, that, as of such date and based
> upon and subject to the assumptions made, methodologies used,
> factors considered and limitations upon their review as described in
> their respective opinions and other matters as J.C. Flowers and FPK
> considered relevant, the proposed exchange ratio to be paid by Bank
> of America in the merger was fair, from a financial point of view, to
> Bank of America.  Bank of America's general counsel and Wachtell,
> Lipton, Rosen & Katz, counsel to Bank of America, discussed with
> the Bank of America board of directors the legal standards applicable
> to its decisions and actions with respect to the proposed transaction
> and reviewed the legal terms of the proposed merger.  Following
> review and discussion among the members of the Bank of America
> board of directors, including consideration of the factors described
> under "— Bank of America's Reasons for the Merger;
> Recommendation of the Bank of America Board of Directors," the
> Bank of America board of directors unanimously determined that the
> transaction was in the best interests of Bank of America and its
> stockholders and voted unanimously to approve the merger
> agreement, the stock option agreement and the transactions
> contemplated by those agreements.

133.     In the section of the Merger Proxy Statement entitled "Bank of America's

Reasons for the Merger; Recommendation of the Bank of America Board of Directors," the BOA

Board provided an exhaustive list of the "material factors" that they considered in approving the

Merger:

- Its [the BOA Board's] understanding of Bank of America's business, operations, financial condition, earnings and prospects and of Merrill Lynch's business, operations, financial condition, earnings and prospects;

- its understanding of the current and prospective environment in which Bank of America and Merrill Lynch operate, including economic and market conditions, the competitive environment and the likely impact of these factors on Bank of America and Merrill Lynch;

- the review by the Bank of America board of directors with its legal advisors of the structure of the merger and the financial and other terms of the merger and stock option agreement, including the review by the Bank of America board of directors with its financial advisors of the exchange ratio, and the expectation of Bank of America's legal advisors that the merger will qualify as a transaction of a type that is generally tax-free for U.S. federal income tax purposes;

- the fact that the complementary nature of the respective customer bases, business products and skills of Bank of America and Merrill Lynch is expected to result in substantial opportunities to distribute products and services to a broader customer base and across businesses and to enhance the capabilities of both companies;

- the potential expense saving opportunities, as a result of overlapping business and infrastructure, corporate staff functions, occupancy and other cost savings from miscellaneous items, currently estimated by Bank of America's management to be approximately $7 billion per year on a pre-tax basis when fully realized, as well as potential incremental revenue opportunities;

- the challenges of successfully integrating Merrill Lynch's businesses, operations and workforce with those of Bank of America and the costs of combining the two companies and achieving the anticipated cost savings, including an anticipated restructuring charge of $3 billion on a pre-tax basis and assumed amortization expense of $450 million per-annum on a pre-tax basis;

- the fact that application of such potential expense savings and other transaction-related assumptions and adjustments to the combined net income forecasts for Bank of America and Merrill Lynch made by various third-party brokerage firms and published as consensus estimates by First Call would result in the combination being 3.0% dilutive in 2009 and breakeven in 2010;

- the reports of Bank of America management and the financial presentation by J.C. Flowers and FPK to Bank of America's board of directors concerning the operations, financial condition and prospects of Merrill Lynch and the expected financial impact of the merger on the combined company;

- the likelihood that the regulatory and stockholder approvals needed to complete the transaction will be obtained in a timely manner and that the regulatory approvals will be obtained without the imposition of adverse conditions;

- the historical and current market prices of Bank of America common stock and Merrill Lynch common stock, as well as the financial analyses prepared by J.C. Flowers and FPK;

- the opinions delivered to the Bank of America board of directors by each of J.C. Flowers and FPK to the effect that, as of the date of the opinion and based upon and subject to the assumptions made, methodologies used, factors considered and limitations upon its review described in its opinion and such other matters as J.C. Flowers and FPK considered relevant, the exchange ratio to be paid by Bank of America was fair, from a financial point of view, to Bank of America;

- the potential impact of the transaction on the capital levels and credit rating of Bank of America; and

- the need and ability to retain key Merrill Lynch personnel.

134.    In announcing this list, the BOA Director Defendants emphasized that "[t]he foregoing discussion of the information and factors considered by the Bank of America board of directors is not exhaustive, *but includes all material factors considered by the Bank of America board of directors.*"  (Emphasis added.)  The BOA Director Defendants thus admit that they gave no consideration either to the liabilities in the various legal proceedings arising from the Merrill Defendants' misconduct in the ARS market or to the massive losses and write-downs to which Merrill was exposed.

135.    The Merger Proxy Statement states that the due diligence investigation BOA made of Merrill began no earlier than the late afternoon of Saturday, September 13, 2008, and was

136.     Similarly, the Merger Proxy Statement states that, in approving the Merger, the BOA Director Defendants considered some 13 "material factors."  However – supposedly due to the "complexity" of those factors – the BOA Director Defendants "did not consider it practical to, nor did [they] attempt to, quantify, rank or otherwise assign relative weights to the specific factors that [they] considered in reaching [their] decision."  Again, such a process could not have been an exercise of informed business judgment.  The more "complex" that individual factors are, the *greater* is the need to weigh, quantify, compare, and contrast them.  The above statement is just a long-winded expression of the fact that the BOA Director Defendants gave their approval hurriedly, with little analysis, and without consideration of the crucial "factor" of whether inheriting Merrill's losses and liabilities could harm, or prove fatal, to BOA.

137.     According to the Merger Proxy Statement, in approving the Merger, the BOA Director Defendants placed heavy reliance on the opinion of BOA's financial advisors, Fox-Pitt Kelton Cochran Caronia Waller (USA) LLC ("FPK") and J.C. Flowers & Co. LLC ("J.C. Flowers").  However,

> [i]n arriving at their respective opinions [deeming the Merger fair to BOA], neither FPK nor J.C. Flowers ascribed a specific range of value to Bank of America or Merrill Lynch, but rather each of FPK and J.C. Flowers made its determination as to the fairness, from a

> financial point of view, to Bank of America of the exchange ratio to be paid by Bank of America in the merger on the basis of such financial, comparative and other analyses as of the date of such opinions.

In other words, according to the BOA Director Defendants, FPK and J.C. Flowers simply took the price BOA proposed to pay for Merrill (expressed as an exchange ratio of BOA shares for Merrill shares) *as a given* and then labored to justify that price. While touting their results as "fairness" opinions, these advisors never considered whether the pre-ordained price that BOA was to pay for Merrill was within an appropriate range of values to begin with, e.g., because BOA was not accounting for the substantial liabilities to be inherited from the Merrill Defendants. As such, those "fairness" opinions were incomplete and untrustworthy, and the BOA Director Defendants' reliance on them was not the product of proper business judgment.

138.    The BOA Director Defendants' agreement to grant complete indemnification to the Merrill Defendants, particularly with no meaningful deliberation having been given to that agreement, constitutes a manifest violation of the BOA Director Defendants' duties of care, good faith, and loyalty to BOA. Indeed, the decision to grant indemnification took place at a time when most or all of the state, federal, and private civil actions against Merrill related to ARS (set forth on Exhibit C hereto) had been commenced and multi-billion dollar settlements were being announced, e.g., the repurchase commitment of $12 billion worth of ARS as a result of the Merrill Defendants' settlement on August 22, 2008.

139.    In absolving the Merrill Defendants, the BOA Director Defendants also violated numerous specific duties that each of these directors undertook as a member of the BOA Board and/or its various Committees set forth in paragraphs 206-216 hereof. For example, the BOA Director of Defendants who were members of the BOA Audit Committee were responsible for "reviewing with management" any "correspondence with regulators or government agencies . . .

which raise significant issues regarding the Corporation's financial statements."  If any "correspondence with regulators" were ever worthy of review, it was a merger target's $12 billion settlement with the SEC and state regulators, and if there were ever a time to review it with relevant management, it was when that management proposed to acquire the merger target for $50 billion. Similarly, if ever there were an "asset quality" issue for the members of the BOA Asset Quality Committee to be concerned with, it was BOA's proposed acquisition of Merrill.  The BOA Director Defendants on these and other BOA Board committees simply looked the other way when their responsibilities most needed to be carried out.

### B.   THE BOA DIRECTOR DEFENDANTS PROCEED WITH THE MERGER AFTER SEPTEMBER 15, 2008, DESPITE MERRILL'S DETERIORATING CONDITION AND THE POISONOUS EFFECT IT WILL HAVE ON BOA.

140.    The BOA Director Defendants further breached their fiduciary duties to BOA and its shareholders by proceeding with the acquisition of Merrill after September 15, 2008, despite their ready access to information concerning Merrill's severely worsening financial condition and the immensely dilutive effect Merrill would have on BOA.  The BOA Director Defendants should have been aware of Merrill's losses and liabilities, and the effect they would have on BOA, yet did not reveal the extent of the losses before the Merger closed on January 1, 2009, thereby foregoing steps that could have spared BOA and locking it into an acquisition that will be remembered for decades as one of the most disastrous ever undertaken in any industry.

141.    The Merger agreement included the following language in paragraph 3.8, defining a "Material Adverse Effect," the occurrence of which would allow BOA to terminate the Merger prior to the scheduled closing on January 1, 2009:

> 3.8    Absence of Certain Changes or Events.  (a) Since June 27, 2008, no event or events have occurred that have had or would reasonably be expected to have, either individually or in the

aggregate, a Material Adverse Effect on Company. As used in this Agreement, the term "Material Adverse Effect" means, with respect to Parent or Company, as the case may be, *a material adverse effect on (i) the financial condition, results of operations or business of such party and its Subsidiaries taken as a whole* . . . . [Emphasis added.]

142.    Certain items were excluded from the definition of "Material Adverse Effect," such as changes in accounting rules, rules and regulations, political conditions, general business conditions, and the like.  These exclusions, however, were not intended to apply if Merrill's conditions took a sharp turn for the worse, as it did.  For example, one exclusion was for "failure, in and of itself, to meet earnings projections, but not including any underlying causes thereof" – indicating that the underlying causes of Merrill's results, such as asset impairments and write-downs, were to be *included*.

143.    Between the December 5, 2008, shareholder vote and the January 1, 2009, closing of the Merger, the BOA Director Defendants possessed ample information to allow them to conclude that the Material Adverse Effect clause should be invoked to terminate the Merger.  On or about December 8, 2008, Merrill Lynch held a board meeting in which its mounting losses and worsening condition were the chief topic of conversation.  In connection with these growing losses, Thain described November as "one of the worst months on Wall Street in history."  Indeed, Merrill had experienced material withdrawals of client funds during the fourth quarter, amounting to approximately $10 billion by the end of the quarter, representing a more than threefold increase over the third quarter.

144.    Despite the size of these losses, Thain told the rest of the Merrill Board that the losses were *in line with BOA's estimates*.  Neither BOA nor Merrill, nor any of the other Defendants, ever disclosed any such estimates – or any other information about the losses expected at Merrill – to

their shareholders in the Merger Proxy Statement.  Likewise, no loss estimates were disclosed in any subsequent filings.

145.    The information reviewed and discussed by Merrill Board of Directors was later shared with Lewis and the other BOA Director Defendants – though not by Thain, who left for a ski trip to Vail, Colorado.

146.    As news of Merrill's worsening condition bubbled up to Lewis, he became increasingly concerned about the appropriateness of the Merger for BOA.  These concerns, however, were never shared with BOA shareholders but instead remained the secret of Lewis and his cronies on the BOA Board.

147.    On or about December 17, 2008 – only 12 days after shareholders voted to approve the Merger – Lewis met in person with Ben Bernanke, Chairman of the Federal Reserve Board, and Henry Paulson, Secretary of the Treasury, to inform them that, given the amount of losses and write-downs at Merrill, BOA lacked the capital to close the Merger without government assistance.  Lewis's in-person meeting had been preceded by a telephone call earlier in December.  Lewis, of course, was well aware of BOA's rights to terminate the Merger under the "Material Adverse Effect" clause, and he threatened to invoke it now.

148.    Bernanke and Paulson urged Lewis not to terminate the Merger.  Bernanke and Paulson told Lewis that, if the deal were scuttled, it would reflect poorly on Lewis and the BOA Director Defendants and suggest that they had not done adequate due diligence of Merrill.  Bernanke and Paulson offered to provide a cash infusion through the additional purchase of shares of BOA preferred stock and a guarantee against the losses which BOA would suffer in acquiring Merrill.  The proposed purchase of additional shares by the federal government would necessarily have a dilutive effect on existing BOA shareholders and cause them harm thereby.

149.     Despite reporting these very substantial Merrill losses to the federal government, the BOA Director Defendants did not update the Merger Proxy Statement or otherwise disclose these material facts to BOA shareholders before the vote.  Nor did they disclose the losses to shareholders after the vote but before the Merger closed on January 1, 2009.  If Merrill's losses were grave enough to cause Lewis to seek government intervention to save the deal, surely those losses were material to shareholders.

150.     The BOA Director Defendants caused BOA to issue a press release on January 1, 2009, announcing the closing of the Merger.  Nothing was said about either the grave losses at Merrill or Lewis's meetings with Bernanke and Paulson.  It was not until January 16, 2009, when BOA pre-announced its fourth quarter earnings, that shareholders began to learn the truth about Merrill.  Since the revelation of these Merrill losses, BOA's market capitalization has been cut in half, eliminating an amount greater than the value of the Merger itself.

151.     The BOA Director Defendants should have known about the existence of the massive losses at Merrill well before the shareholder vote.  As quoted by the *Wall Street Journal*, the BOA Director Defendants have claimed that "Beginning in the second week of December, and progressively over the remainder of the month, market conditions deteriorated substantially relative to market conditions prior to the December 5 shareholder meeting."  Yet general market conditions, and the mark-to-market nature of those losses, do not support the story that the Merrill asset losses somehow materialized in a single week following the shareholder vote.  These defendants also cannot blame the losses on impairments to a particular asset class, because BOA's supplemental fourth quarter earnings information reflects that the Merrill losses were spread across a variety of asset classes, including, among others, "CDS-related exposure, auction rate securities and legacy trading books, [and] write-downs in leveraged finance."  In addition, these defendants have not

identified any particular asset class that decreased in value so sharply between the shareholder vote and the following two weeks, when they acknowledge they knew about the Merrill losses.

152.   Lewis subsequently has admitted that, well before the Merger closed, the BOA Director Defendants were aware of both Merrill's deteriorating condition and BOA's right to withdraw from the Merger or seek to renegotiate it.   In BOA's January 16, 2009, earnings conference call with shareholders, Lewis was asked "what, if anything, was missed in due diligence of Merrill Lynch that brought us to this point."   Lewis responded as follows:

> As we saw the anticipated fourth quarter losses accelerating, we did evaluate our rights under the merger agreement.  And during that time we spoke to – and were in close coordination with officials from both the Treasury and the Federal Reserve.
>
> The government was firmly of the view that terminating or delaying the closing of the transaction could lead to significant concerns and could result in serious systemic harm.  And a re-pricing, assuming it could be agreed, would have required a new stockholder vote both at Bank of America and at Merrill Lynch and therefore we would have been delayed by at least a couple of months.  And that would have led to considerable uncertainty and could have well cost more than the re-pricing that we would have saved.
>
> And I think in recognition – the position that Bank of America was in, both the Treasury and the Federal Reserve gave us assurances in December that we should close the deal and that the government would provide the assistance we've been talking about.   So particularly ringing – putting a fence around some of the assets that we were most concerned about.  And so in view of all of those considerations, and in view that strategically Merrill Lynch remains a solid franchise, we just thought it was in the best interests of our company and our stockholders and the country to move forward with the original terms and the timing.

153.   However, instead of determining to stop the Merger, or at least renegotiate its price, the BOA Director Defendants forged ahead with the deal anyway, without breathing a word of any concern to shareholders.   Asked why the Board had chosen this course of action, Lewis later commented that "we did think we were doing the right thing for the country."   But assuming the

mantle of patriotism cannot obviate the fact that BOA shareholders were never informed of the decision, which was theirs to participate in, if not decide. BOA shareholders were entitled to know all the material facts and options before a decision was made for them.

### C. BOA'S SHAREHOLDERS ARE CAUSED TO VOTE TO APPROVE THE MERGER THROUGH A FALSE AND MISLEADING PROXY STATEMENT.

154.    The BOA Director Defendants, the Merrill Defendants, Price, and the Advisor Defendants harmed BOA by causing BOA shareholders to approve BOA's acquisition of Merrill through the means of a false and misleading proxy statement. As a consequence, BOA acquired a company whose losses and liabilities have already begun to overwhelm BOA, transforming what was supposed to be an accretive acquisition into one which represents an immense *destruction* of assets for BOA and, indeed, threatens to sink the company altogether.

155.    The terms of the Merger were set forth in the Merger Proxy Statement, dated October 31, 2008, which was filed with the SEC on November 3, 2008, and mailed to all shareholders of record of BOA and Merrill Lynch (including Plaintiff) as of the record date of October 10, 2008. The Merger Proxy Statement solicited proxies from shareholders on behalf of BOA and the BOA Director Defendants to vote in favor of the Merger at a special meeting of shareholders on December 5, 2008. Under the terms of the Merger agreement, BOA would exchange .8595 shares of BOA common stock for each Merrill common share.

### Statements Incorporated into the Merger Proxy Statement

156.    The Merger Proxy Statement incorporated by reference several documents, including Merrill's Form 8-K filing dated October 16, 2008. That Form 8-K, in turn, included Merrill's press release announcing results for the third quarter, ending September 30, 2008, as well as a preliminary

unaudited earnings summary for the quarter.  These results indicated a net loss from continuing operations of $5.1 billion, and an overall net loss of $5.2 billion.

157.    The October 16, 2008, Form 8-K reported that Merrill had experienced negative $6.5 billion "principal transactions revenues,"[3] indicating a net loss due to realized and unrealized losses (including trading losses, asset impairments and write-downs, and declines in mark-to-market valuations) in the securities held on its balance sheet.

158.    Among the "significant items" causing such large negative revenues were $12.1 billion in asset losses and write-downs described as follows:

- Net write-downs of $5.7 billion resulting from the previously announced sale of U.S. super senior ABS CDOs[1] and the termination and potential settlement of related hedges with monoline guarantor counterparties

        *    *    *

- Net write-downs of $3.8 billion principally from severe market dislocations in September, including real estate-related asset write-downs and losses related to certain government sponsored entities and major U.S. broker-dealers, as well as the default of a U.S. broker-dealer

        *    *    *

- Net losses of $2.6 billion resulting primarily from completed and planned asset sales across residential and commercial mortgage exposures

159.    The Form 8-K emphasized the positive developments at Merrill in reducing balance sheet exposure, including a highly positive comment from defendant Thain, Chairman of Merrill, regarding improvements in that area:

---

[3] "Principal transactions revenues" are described by Merrill as including "both realized and unrealized gains and losses on trading assets and trading liabilities, investment securities classified as trading investments and fair value changes associated with structured debt.  These investments are recorded at fair value. . . .  Gains and losses are recognized on a trade date basis."

**Third Quarter and First Nine Months of 2008 Highlights**

- Bank of America Corporation agreed to acquire Merrill Lynch & Co. in an all-stock transaction

- Record year-to-date and third highest quarterly revenues in Rates and Currencies, up 27% from prior year-to-date

- Global Equity Linked Products (Derivatives) net revenue growth of 23% sequentially and 14% year-on-year

- Advisory revenues outperformed the market, increasing 12% sequentially; Merrill Lynch also ranked #2 in global announced M&A for the quarter

- Solid performance in Global Wealth Management despite challenging market environment; FA headcount increased by 240 from a year ago; Net new annuitized assets are up $21 billion year-to-date

- *Significant progress in balance sheet and risk reduction*; RWA declined by approximately 15% over the quarter

- *Substantial sale of $30.6 billion of gross notional amount of U.S. super senior ABS CDOs*

- *Reductions of 98% of U.S. Alt-A residential mortgage net exposures.* Including planned sales, reductions of 56% in non-U.S. residential mortgages and 25% in commercial real estate, excluding First Republic Bank and the U.S. Banks Investment Securities Portfolio

- *Enhanced capital base* through a $9.8 billion common stock offering and the $4.425 billion sale of the Bloomberg stake

- Subsequent to the third quarter, and as part of Bank of America's $25 billion participation in the TARP Capital Purchase Program, Merrill Lynch agreed and expects to issue $10 billion of non-voting preferred stock and related warrants to the U.S. Treasury pursuant to the program.

  "*We continue to reduce exposures and de-leverage the balance sheet prior to the closing of the Bank of America deal*," said John A. Thain, chairman and CEO of Merrill Lynch. "As the landscape for financial services firms continues to change and our transition teams make good progress, we believe even more that the transaction will create an unparalleled global company with pre-eminent scale, earnings power and breadth." [Emphases added; footnote omitted.]

160. The Merger Proxy Statement also specifically incorporated by reference future documents to be filed with the SEC and made publicly available:

In addition, Bank of America and Merrill Lynch also incorporate by reference additional documents that either company files with the SEC under Sections 13(a), 13(c), 14 and 15(d) of the Securities Exchange Act of 1934, as amended, between the date of this document and the date of the Merrill Lynch special meeting. These documents include periodic reports, such as Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q and Current Reports on Form 8-K, as well as proxy statements.

161.    The Merger Proxy Statement also incorporated by reference Merrill's filings on Form 10-Q for the quarters ended March 31, 2008, June 30, 2008, and September 30, 2008.  Each of these filings contained a certification by Deloitte, Merrill's independent registered public accounting firm, that no "material modifications" were necessary in Merrill's financial statement to make them accurate.  Deloitte's certification in the Form 10-Q for the third quarter 2008, for example, provided that:

We have reviewed the accompanying condensed consolidated balance sheet of Merrill Lynch & Co., Inc. and subsidiaries ("Merrill Lynch") as of September 26, 2008, and the related condensed consolidated statements of (loss)/earnings and comprehensive (loss)/income for the three-month and nine-month periods ended September 26, 2008 and September 28, 2007, and the related condensed consolidated statements of cash flows for the nine-month periods ended September 26, 2008 and September 28, 2007. These interim financial statements are the responsibility of Merrill Lynch's management.

We conducted our reviews in accordance with the standards of the Public Company Accounting Oversight Board (United States). A review of interim financial information consists principally of applying analytical procedures and making inquiries of persons responsible for financial and accounting matters. It is substantially less in scope than an audit conducted in accordance with the standards of the Public Company Accounting Oversight Board (United States), the objective of which is the expression of an opinion regarding the financial statements taken as a whole. Accordingly, we do not express such an opinion.

*Based on our reviews, we are not aware of any material modifications that should be made to such condensed consolidated interim financial statements for them to be in conformity with accounting principles generally accepted in the United States of America.* [Emphasis added.]

162.    Similarly, the Merger Proxy Statement incorporated by reference Merrill's filing on Form 10-K for the year ended December 31, 2007.   That form 10-K contained Deloitte's certification that:

> We have audited the consolidated financial statements of Merrill Lynch & Co., Inc. and subsidiaries ("Merrill Lynch") as of December 28, 2007 and December 29, 2006, and for each of the three years in the period ended December 28, 2007, and the effectiveness of Merrill Lynch's internal control over financial reporting as of December 28, 2007, and have issued our reports thereon dated February 25, 2008 (which reports express unqualified opinions . . .). We have also previously audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of Merrill Lynch as of December 30, 2005, December 31, 2004, and December 26, 2003, the related consolidated statements of earnings, changes in stockholders' equity, comprehensive income, and cash flows for the years ended December 31, 2004, and December 26, 2003 (none of which are presented herein); *and we expressed unqualified opinions on those consolidated financial statements. . . .*
>
> *In our opinion, the information set forth in the "Selected Financial Data" table under the captions "Results of Operations," "Financial Position" and "Common Share Data," for each of the five years appearing on page 19, is fairly stated, in all material respects, in relation to the consolidated financial statements from which it has been derived.*  [Emphasis added.]

163.    Moreover, the Merger Proxy Statement, under the heading of "Experts," stated that Deloitte's opinion formed an integral part of the Merger Proxy Statement:

> The consolidated financial statements and the related financial statement schedule incorporated by reference in this registration statement [sic] from Merrill Lynch & Co., Inc.'s Annual Report on Form 10-K for the year ended December 28, 2007, and the effectiveness of Merrill Lynch & Co., Inc. and subsidiaries' internal control over financial reporting have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their reports, incorporated herein by reference (*which report on the consolidated financial statements expresses an unqualified opinion . . .*). Such consolidated financial statements have been so incorporated in reliance upon the reports of such firm given upon their authority as experts in accounting and auditing.

**"Fairness" Opinions by the Advisor Defendants**

164.    J.C. Flowers and FBK each provided a "fairness" opinion in the Merger Proxy Statement concluding that the proposed purchase price of Merrill was "fair, from a financial point of view, to Bank of America." These "fairness" opinions were dated September 14, 2008, the same day that the negotiations concerned the Merger had first begun. The opinions were included in the Merger Proxy Statement sent to BOA shareholders.

165.    In the Merger Proxy Statement, Defendants FPK and J.C. Flowers provided "fairness" opinions to BOA shareholders stating that, in those Advisor Defendants' opinion, the Merger was fair, from a financial point of view, to BOA.

166.    The FPK "fairness" opinion stated, in part:

> You have requested our opinion as to the fairness, from a financial point of view, to Bank of America Corporation (the "Company") of the Exchange Ratio (as defined below) to be paid by the Company pursuant to the terms of, and subject to the conditions set forth in, the Agreement and Plan of Merger to be dated as of September 15, 2008 (the "Merger Agreement") by and between the Company and Merrill Lynch & Co., Inc. ("Merrill Lynch").
>
> * * *
>
> In connection with our review of the proposed Merger and the preparation of our opinion herein, we have examined: (a) the financial terms and conditions of a preliminary draft of the Merger Agreement; (b) certain audited historical financial statements of the Company and of Merrill Lynch for the five years ended December 31, 2007; (c) information regarding the strategic, financial and operational benefits anticipated from the Merger and the prospects of the Company (with and without the Merger); (d) the pro forma impact of the Merger on the earnings per share of the Company (before and after taking into consideration any goodwill created as a result of the Merger) based on certain pro forma financial information prepared by the senior management of the Company; (e) information regarding the amount and timing of potential cost savings and related expenses and synergies which senior management of the Company expects will result from the Merger, as well as certain estimated restructuring charges and negative revenue adjustments which senior management of the Company expects to result from the Merger (the

"Expected Synergies"); (f) information regarding publicly available financial terms of certain recently-completed transactions in the investment banking industry; (g) current and historical market prices and trading volumes of the common stock of the Company and Merrill Lynch; and (h) certain other publicly available information on the Company and Merrill Lynch.

\* \* \*

In rendering our opinion, we have assumed and relied, without independent verification, upon the accuracy and completeness of all the information examined by, or otherwise reviewed or discussed with, us for purposes of this opinion. We have not made or obtained an independent valuation or appraisal of the assets, liabilities (contingent, derivative, off-balance sheet or otherwise) or solvency of the Company or Merrill Lynch, including particularly any mark-to-market balance sheet adjustments resulting from the Merger, market conditions or otherwise. We relied solely upon information provided to us by the Company and other publicly available information with respect to Merrill Lynch's financial condition, results of operations and prospects.

\* \* \*

*Based upon and subject to the foregoing, we are of the opinion that, as of the date hereof, the Exchange Ratio to be paid by the Company in the Merger is fair, from a financial point of view, to the Company. This opinion has been approved by our fairness committee.* [Emphasis added.]

167. The J.C. Flowers "fairness" opinion stated, in part:

You have requested our opinion as of the date hereof as to the fairness, from a financial point of view, to Acquiror of the Exchange Ratio. In connection with this opinion, we have: (i) reviewed the financial terms and conditions of the Merger; (ii) analyzed certain historical and prospective business and financial information relating to the Company and Acquiror; (iii) held discussions with members of the senior managements of the Company and Acquiror with respect to the businesses and prospects of the Company; (iv) reviewed public information with respect to certain other companies we believed to be relevant; (v) reviewed the financial terms of certain business combinations involving companies we believed to be relevant; (vi) reviewed historical stock prices and trading volumes of the Company common stock and Acquiror common stock; and (vii) conducted such other financial studies, analyses and investigations as we deemed appropriate.

\* \* \*

> *Based on and subject to the foregoing, we are of the opinion*
> *that as of the date hereof the Exchange Ratio is fair, from a financial*
> *point of view, to Acquiror.*   [Emphasis added.]

168.    Both the FPK "fairness" opinion and the J.C. Flowers "fairness" opinion were false and misleading, in that, at the time they were issued and subsequently, FPK and J.C. Flowers lacked a reasonable basis to conclude that the Merger was fair to BOA.

### The Merger Proxy Statement Indicates that BOA Will Need No More than $25 in Federal Assistance, Including to Complete the Merger

169.    Under the heading "Recent Developments," the Merger Proxy Statement disclosed that BOA had agreed to sell $25 billion in preferred stock to the United States Government pursuant to the Capital Purchase Program ("CPP") effectuated by Congress in the Emergency Economic Stabilization Act of 2008.   This amount included $10 billion of preferred stock related to the acquisition of Merrill if the Merger were consummated:

> On October 3, 2008, President Bush signed into law the Emergency Economic Stabilization Act of 2008 (the "EESA"). Pursuant to the EESA, the U.S. Treasury has the authority to, among other things, invest in financial institutions and purchase mortgages, mortgage-backed securities and certain other financial instruments from financial institutions, in an aggregate amount up to $700 billion, for the purpose of stabilizing and providing liquidity to the U.S. financial markets. On October 14, 2008, the U.S. Treasury announced a plan, referred to as the Capital Purchase Program, or the CPP, to invest up to $250 billion of this $700 billion amount in certain eligible U.S. banks, thrifts and their holding companies in the form of non-voting, senior preferred stock initially paying quarterly dividends at a 5% annual rate. In the event the U.S. Treasury makes any such senior preferred investment in any company it will also receive 10-year warrants to acquire common shares of the company having an aggregate market price of 15% of the amount of the senior preferred investment. In connection with Treasury's 2008 announcement, Bank of America was identified as one of the nine financial institutions (including Merrill Lynch) that agreed in principle to participate in the first $125 billion of Treasury investments. As a result, on October 26, 2008, Bank of America entered into a purchase agreement with the U.S. Treasury pursuant to which it will issue to the U.S. Treasury $15 billion of a new series of preferred stock of Bank of America. In

connection with this investment, Bank of America has also agreed to issue to the U.S. Treasury warrants to purchase approximately 73 million shares of Bank of America common stock at an exercise price of $30.79 per share. This investment is expected to be completed on or about October 28, 2008. If the merger is completed prior to Treasury making an investment in Merrill Lynch as described below under "— Merrill Lynch & Co Developments — Unaudited — Recent Developments," Treasury will purchase from Bank of America an additional $10 billion of a new series of preferred stock of Bank of America and receive warrants to purchase approximately 49 million shares, all on the same terms applicable to the $15 billion investment.

170.    The Merger Proxy Statement disclosed that Merrill would *not* participate in the CPP with the federal government, pending the outcome of the Merger.

### The Merger Proxy Statement Recommends Approval of the Merger

171.    Based on the 13-factor analysis set forth *supra*, ¶ 133, the BOA Director Defendants unequivocally recommended that BOA's approve the shareholder:

**Recommendation of the Bank of America Board of Directors**

The Bank of America board of directors has unanimously approved and adopted the merger agreement and the transactions it contemplates, including the merger.  The Bank of America board of directors determined that the merger, merger agreement and the transactions contemplated by the merger agreement *are advisable and in the best interests of Bank of America and its stockholders and unanimously recommends that you vote "FOR" approval of the issuance of shares of Bank of America common stock in the merger.* [Emphasis added.]

172.    The Merger Proxy Statement indicated that the Merger would be "3.0 dilutive in 2009 and breakeven in 2010," based on estimates by other brokers.  In addition, the Merger Proxy Statement included detailed reported results with respect to Merrill's operations for the quarter ending June 30, 2008 and, under a heading titled "Recent Developments," also discussed more recent financial results of Merrill.

## The Merger Proxy Statement is False and Misleading

173.     The Merger Proxy Statement (including the SEC filings and other documents incorporated by reference therein) contained material misstatements and omissions, precluding Plaintiff and other BOA shareholders from casting informed votes with respect to the Merger. Among other items:

(a)     The Merger Proxy Statement significantly overvalued Merrill's assets, undervalued its losses and liabilities, and otherwise concealed its true financial condition from BOA shareholders, *inter alia*, by overstating the assets recorded on Merrill's balance sheet as of no later than the third quarter of 2008.

(b)     The Merger Proxy Statement did not inform shareholders of the significant risks and liabilities BOA and its shareholders would be assuming in the Merger, including the repercussions from the Merrill Defendants' misconduct in the ARS market and other derivative securities markets as well as other losses – repercussions which included Merrill's payment of a $125,000,000 fine, commitment to repurchase $12 billion worth of ARS, and exposure to multiple securities class actions and other legal proceedings.

(c)     The Merger Proxy Statement, while disclosing that the Merrill Defendants would be indemnified by BOA for all liabilities, did not provide shareholders with any concrete information concerning the scope and severity of those liabilities.  This failure deprived shareholders of a basis to accurately gauge the Merrill Defendants' basis for recommending approval of the Merger, and it precluded an informed evaluation of the exposure which BOA was assuming in acquiring Merrill.

(d)     The Merger Proxy Statement did not disclose that the "fairness" opinions provided by the Advisor Defendants were based on inadequate information.

(e)     The Merger Proxy Statement identified 12 distinct "Risk Factors" on pages 23-26 thereof and stated that "stockholders should consider the matters described below in determining whether to adopt the merger agreement."  None of the Risk Factors disclosed the specific risk that Merrill's assets were too complex and illiquid to value with any degree of specificity, or that there was a substantial risk that the true value of those assets was substantially less than the stated value, impairing the value of the Merger to BOA shareholders.

(f)     The Merger Proxy Statement misrepresented the benefits of the Merger, including the value of the assets to be acquired by BOA.

(g)     The Merger Proxy Statement misrepresented that Merrill continued to "reduce exposures and de-leverage the balance sheet."

(h)     The Merger Proxy Statement omitted to disclose that Merrill's financial results, and losses on principal transactions during the fourth quarter of 2008, were sufficient to trigger the termination of the Merger due to the occurrence of a material adverse event.

(i)     The Merger Proxy Statement omitted information about the magnitude and impact of losses incurred by Merrill during the fourth quarter of 2008.

(j)     The Merger Proxy Statement misrepresented and omitted to disclose information concerning the risks of acquiring Merrill and the potential for material write-downs, impairments, and losses on assets held by Merrill.

174.    Moreover, despite the fact that BOA shareholders did not vote on the Merger until December 5, 2008, over two-thirds of the way into the fourth quarter, the Merger Proxy Statement was not updated, corrected, amended, or supplemented with any information concerning the actual losses, impairments, and write-downs being incurred by Merrill during the fourth quarter of 2008, or

the risk that such losses would materially affect the value of the deal to BOA if the Merger were consummated.  Nor was the Merger Proxy Statement updated or corrected to reflect the fact that Bank of America would be required to seek additional funding from the United States Government specifically to complete the Merger.

175.    As set forth herein, the BOA Director Defendants had access to the facts concerning each of the above misstatements or omissions.

176.    The Merger Proxy Statement was rendered further false and misleading by the BOA Director Defendants and the Merrill Defendants' public statements communicated to shareholders after the deal was announced and before the shareholder vote.

177.    At a press conference on September 15, 2008, the day the Merger was announced, Lewis was asked about Bank of America's due diligence on the acquisition, given that it was completed over a single weekend.  Defendant Price, BOA's CFO, replied with lavish assurances that the BOA Defendants had done their homework:

> We have had a tremendous amount of historical knowledge, both as a competitor with Merrill Lynch, but also have reviewed and analyzed the company over the years.
>
> As Ken [Lewis] referenced, we did have an adviser several among them, *JC Flowers with pretty extensive knowledge of the company*. And while none of us like the market turmoil we have been through in the last year, it has caused us all to be much more attuned to the quality of particular name credits and/or other asset classes, so it's not as if we don't have a very significant knowledge of the markets around the asset classes that are most problematic.
>
> In addition, as you would expect, we deployed the team that we would ordinarily deploy in these types of situations, which had well over 45 people from our team on site as well as others off site, outside counsel, and the like. So collectively with that group *and quite frankly, the progress that Merrill Lynch had made in reducing the risk exposures such, and analyzing them and having all of that laid out*, given the efforts that the management team has made over the last period, made it possible for us.  [Emphasis added.]

178.    At the press conference, Lewis bragged about not needing government funds for the Merger: "Well, first of all, I've had a lot of conversations with Secretary Paulson over the last week or so about the Lehman issue and ideas that we had, but I will leave those to just to be in private. But we have asked for no relief, no capital relief on this deal."

179.    Similarly, Lewis reassured investors about Merrill's overall viability, based on the review by J.C. Flowers:

> J.C. Flowers or Chris Flowers is someone we've known for quite some time. We've done several deals with him. We know his firm very well, and it was fortunate that we did because his firm — he and his firm had done quite an amount of due diligence on Merrill Lynch fairly recently, and it was very, very extensive. They had looked at the marks very comprehensively, so this allowed us to have him and team as an adviser, and just update the information they already had. So that was one of the key ingredients to being able to do this as quickly as we did….*I will say that Chris [Flowers'] comment was "it's night and day from the time we first looked at it to now." He was very complimentary of what John [Thain] and his team had done in terms of dramatically reducing the marks, in many cases not only — not reducing the marks but getting rid of the assets, which is the best thing to do, so a much lower risk profile than he'd seen earlier on*….We actually thought Merrill Lynch's capital structure was very good and had a lot more of a base of common equity than some others we had seen, so it looks good. [Emphasis added.]

180.    On BOA's third-quarter earnings call with analysts, broadcast on October 6, 2008, just after BOA had raised $10 billion in the market, an analyst asked the BOA Defendants whether BOA would need more money to cover the Merrill acquisition. Defendant Price assured the analyst that it would not: "We have considered the Merrill deal in our [intentions] here so that the numbers we were talking about as I've mentioned in the prepared remarks covered our anticipated needs from a Merrill standpoint."

**Defendants Should Have Known of the False and**
**Misleading Nature of the Merger Proxy Statement**

181.    At the time of the issuance of the Merger Proxy Statement and afterwards, the BOA

Director Defendants, the Merrill Defendants, Price, and the Advisor Defendants should have known

that Merrill's financial condition was dramatically deteriorating, and that the Merger Proxy

Statement contained the misstatements and omissions set forth herein.

182.    When the Merger was first announced on September 15, 2008, questions were raised

by securities analysts concerning the valuation of Merrill at $29 per share, given Merrill's

accumulating losses and uncertain future.

183.    During a conference call with analysts on September 15, 2008, Matthew O'Connor,

an analyst at UBS, pointed out that "there's a lot of near-term uncertainty and I think a lot of people

would view Merrill's stock as selling off today and this week if the deal hadn't been announced.  I

guess the question is why pay $29 at this point?"  Another analyst raised the issue of the necessity of

large write-downs on Merrill's assets, and asked whether the financial numbers presented with the

announcement included any mark-to-market write-downs.  Defendant Lewis quelled such concerns,

stating:

> The numbers that we presented today we have considered marks on
> the assets . . . .  I would tell you that, again, going back to the point of
> things such as CDOs, we have very similar methodology valuations
> and we have very similar marks to structures.  We are dealing with the
> same counterparties on things so again, we're pretty familiar with
> the types of assets and feel pretty good about the progress that Merrill
> Lynch has made.

184.    Once they digested the news of the Merger and took a close look at Merrill, other

analysts noted the necessity of further asset write-downs at Merrill that would drastically impair the

value of the Merger to BOA.  A Deutsche Bank analyst reported, dated September 16, 2008, stated:

> The big question surrounding capital market businesses [such as Merrill's] is, "how much more in write-downs are likely ahead?"  In particular, a new weakness at AIG has the potential to hurt Merrill's capital via any potential insurance on its ABS CDO.  Alternatively, additional selling of risky commercial or residential real estate assets could impact Merrill's commercial real estate securities ($18B), other risky mortgage assets ($31B; includes $10B alt-A, subprime and non-US residential), and leveraged finance ($8B), not withstanding declines in these amounts since the end of 2Q08.  In additions to the "risky" assets, Merrill also has $33.7B in US prime mortgages on balance sheet.

185.    On November 6, 2008, Merrill reported financial results for the quarter ending September 30, 2008.  Those results included substantial write-downs in Merrill's assets and resulted in Merrill reporting a net loss of over $5 billion.  Similarly, in a *Wall Street Journal* article on November 8, 2008, it was revealed that Merrill Lynch was "planning to sell roughly $4 billion of distressed debt securities, including mortgages and complex investments, in a bid to cut its exposure to risky assets."  An article in the *Journal* dated November 17, 2008 indicated that the United States Treasury would provide $10 billion to Merrill under the Troubled Asset Relief Program after the Merger was completed.

186.    Of course, the BOA Director Defendants did not need analysts, or even Merrill's publicly announced results, to uncover the truth about Merrill.  These defendants had unfettered access to Merrill's financial and accounting records beginning no later than September 15, 2008, the day the Merger was announced.

187.    Under the terms of the Merger agreement, paragraph 6.1, Merrill was obligated to fully cooperate with BOA and the BOA Director Defendants in providing any information necessary in connection with the Merger Proxy Statement.  Similarly, under paragraph 6.2, the BOA Defendants enjoyed complete and unfettered access to Merrill's financial and accounting records:

> Upon reasonable notice and subject to applicable laws relating to the confidentiality of information, *each of Company and Parent shall,*

> *and shall cause each of its Subsidiaries to, afford to the officers,
> employees, accountants, counsel, advisors, agents and other
> representatives of the other party, reasonable access, during normal
> business hours during the period prior to the [Merger's closing], to
> all its properties, books, contracts, commitments and records*, and,
> during such period, such party shall, and shall cause its Subsidiaries
> to, make available to the other party . . . all . . . information
> concerning its business, properties and personnel as the other party
> may reasonably request . . . .  [Emphasis added.]

188.   Such access included access to Merrill's profit and loss ("P&L") reports, which

showed the facts of Merrill's deteriorating positions.  Indeed, in a memo to Merrill employees

following his termination, Defendant Thain stated:

> [T]he losses in the fourth quarter . . . were very large and unfortunate.
> However, they were incurred almost entirely on legacy positions and
> were due to market movements. *We were completely transparent with
> Bank of America. They learned about these losses when we did. The
> acting CFO of my businesses was Bank of America's former Chief
> Accounting Officer. They had daily access to our p&l, our positions
> and our marks*.  [Emphasis added.]

189.   Despite the BOA Director Defendants' access to that information, neither the Merger

Proxy Statement, nor any supplements thereto, disclosed the dramatic decreases in the value of

Merrill's assets or the company's increasing losses.  The BOA Director Defendants, the Merrill

Defendants, Price, and the Advisor Defendants failed in their duty to update and correct the material

misstatements and omissions in the Merger Proxy Statement.  To the contrary, these defendants

reassured shareholders about the tremendous value BOA supposedly was getting in acquiring

Merrill.

190.   BOA's shareholders approved the Merger in a special meeting held on December 5,

2008.  Lacking the material facts necessary to make an informed decision on whether to approve

BOA's acquisition of Merrill, 82 percent of BOA's shareholders voted to approve the Merger and

the issuance of additional BOA shares necessary to complete it.  The BOA Director Defendants promptly issued a press release announcing that the shareholders had approved the Merger.

191.    Almost immediately after the votes were tallied, the BOA Director Defendants went to the United States Government to seek additional assistance (on top of the $25 billion already received in the fall).  BOA Chairman Lewis expressly advised the Treasury that BOA would not be able to close the deal without billions more in assistance, due to Merrill's substantially deteriorated financial condition.  Lewis was successful, securing a promise of $20 billion in direct assistance to complete the Merger, as well as guarantees and indemnifications for $118 billion in additional exposure.  Of this amount, fully 75 percent – or $88.5 billion – arises from Merrill losses and liabilities.  The Merger was consummated on January 1, 2009.

D.    **THE TRUTH EMERGES CONCERNING MERRILL'S POISONOUS EFFECT ON BOA.**

192.    On January 14, 2009, after the stock market closed for the day, the *Wall Street Journal* reported that BOA was near an agreement with federal officials that would provide BOA with massive financial assistance from the government, including an infusion of fresh capital and the "backstopping" of tens of billions of dollars in toxic assets to help it close the acquisition of Merrill. The *Journal* further reported that the additional funding had been sought earlier in December by defendant Lewis under the CPP:

> The U.S. government is close to finalizing a deal that would give billions in additional aid to Bank of America Corp. to help it close its acquisition of Merrill Lynch & Co., according to people familiar with the situation.
>
> Discussions over these funds began in mid-December when Bank of America approached the Treasury Department.  The bank, already the recipient of $25 billion committed federal rescue funds, said it was unlikely to complete its Jan. 1 purchase of the ailing Wall Street securities firm because of Merrill's larger-than-expected losses in the fourth quarter, according to a person familiar with the talks.

193.    On January 15, 2009, multiple news services carried the story of an impending government bailout, or even nationalization, of BOA relating to its acquisition of Merrill.  The *New York Times* reported that day that defendant Lewis had sent lawyers to New York in December to explore BOA's ability to terminate the Merger under the "Material Adverse Effect" provision.  In reaction to this and similar news reports, the BOA Director Defendants announced that they would move up their announcement of BOA's fourth quarter earnings to the next day.  The price of BOA common stock declined from $10.20 to $8.32 that day, a drop of over 18 percent.

194.    On January 16, 2009, BOA disclosed its disastrous fourth-quarter results.  The company had a net loss of $1.79 billion, with $15.3 billion in losses attributable to Merrill.  BOA also disclosed that it would obtain $20 billion aid from the federal government to help it absorb Merrill's toxic securities, including ARS, and that the government would provide protection against losses on $118 billion in selected capital markets exposure.  The results included at least $8.75 billion in additional write downs related to Merrill.

195.    The *Wall Street Journal* reported that day, in an article entitled "BofA's Latest Hit: Treasury to Inject $20 Billion More; Stock at 1991 Level," that the current market value of the *combined* BOA/Merrill was *less* than BOA's stand-alone market value prior to the announcement of the Merger, implying that the market viewed Merrill as having *negative value*.

196.    The *Wall Street Journal* further reported:  "[t]he development angered some Bank of America shareholders who began to question why . . . Lewis didn't discover the problems prior to the Sept. 15 deal announcement.  Many also wanted to know why he didn't disclose the losses prior to the vote on the Merrill deal on Dec. 5 or before closing the deal on Jan. 1"  The article quoted Bradley Dorman, managing partner of White Rock Point Partners, an investment adviser which held

315,000 shares of BOA, as stating that: "Bank of America didn't do proper due diligence." The price of BOA common stock declined from $8.32 to $7.18 that day, a drop of 14 percent.

197.    On January 17, 2009, an article entitled "Bank of America Goes on Offense: Stock Tanks on Quarterly Loss; Details of Bailout; Employees Angry" in the *Wall Street Journal* quoted Paul Miller, a securities analyst with the Friedman Billings Ramsey Group, as stating that Lewis "has very little credibility with the investor public right now." Thereafter, on January 20, 2009, analysts opined that, based on the new information made available, BOA would need to raise at least $80 billion to restore its capital to adequate levels for a bank of its size and scope. The price of BOA common stock declined from $7.18 to $5.10 that day, a drop of 29 percent.

198.    All told, between January 14, 2009, and January 20, 2009, the price of BOA's stock declined from $10.20 to $5.10, a decline of exactly *50 percent in just three trading days*.

## III.    DEMAND FUTILITY ALLEGATIONS.

199.    Demand upon the BOA Board that they institute this action in the Parent's name, for both wrongs committed against its wholly-owned subsidiary Merrill and wrongs committed directly against BOA also would be entirely futile, and is excused.

200.    The BOA Board consists of sixteen (16) individuals (referred to here as the BOA Director Defendants): Lewis, Gifford, Barnet, Bramble, Collins, Countryman, Franks, Lozano, Massey, May, Mitchell, Ryan, Sloan, Spangler, Tillman, and Ward. None of these individuals is disinterested and independent with respect to the acts and omissions alleged herein.

201.    First, reasonable doubt exists that the BOA Director Defendants could fairly address a pre-suit demand in this action, because given the massive liabilities faced by Merrill for ARS-related misconduct, the rushed decision to assume such liabilities which could seriously or fatally damage BOA could not have been the product of business judgment. Moreover, the BOA

Director Defendants are conflicted from prosecuting claims against the Defendants because they face a substantial likelihood of liability for breaching their duties to BOA and its shareholders in connection with assuming those liabilities in the Merger with Merrill. The BOA Director Defendants caused BOA to indemnify the Merrill Defendants to fullest extent possible in the Merger. Thus, there is reasonable doubt that the BOA Director Defendants would institute suit against the Merrill Defendants when BOA in effect agreed to take all necessary actions to insure that Merrill wrongdoers were *never* sued. As a result of the indemnification, the BOA Director Defendants would be forced to oppose the institution of any suit seeking damages against the Merrill Defendants. Pre-suit demand on the BOA Board therefore is futile.

202.    Second, the BOA Director Defendants face a substantial likelihood of liability herein for making false and misleading statements in the Merger Proxy Statement. Claims under Section 14(a) do not require proof of scienter, and the allegations concerning BOA Director Defendants' access to the facts concerning Merrill's rapidly deteriorating financial condition in the fourth quarter of 2008 are strong. Similarly strong are the allegations that the BOA Director Defendants breached their fiduciary duties in approving the Merger with Merrill based upon inadequate due diligence; failing to scrap the deal or at least provide corrected and updated information to shareholders concerning Merrill's financial condition before the December 5, 2008, shareholder vote; and failing to scrap the deal or provide further information after the shareholder vote, even while Lewis sought nearly $100 billion dollars in federal assistance directly tied to helping the deal go through.

203.    Third, the BOA Director Defendants will not knowingly sue Lewis and other members of the BOA Board of Directors for proceeding with the Merger in violation of their fiduciary duties, given that the these defendants reportedly received pressure from the federal

government, including both the Department of the Treasury and the Federal Reserve System, to complete the Merger in spite of any difficulties.  Suing the BOA Board would jeopardize BOA's relationship with the federal government, on which BOA has become utterly dependent for capital infusions and its very existence as a private enterprise.

204.     Fourth, the BOA Director Defendants face a disabling litigation conflict of interest in defending both Section 14(a) claims and breach of fiduciary duty claims related to the Merger.   To defend the fiduciary claims, the BOA Director Defendants will be concerned to emphasize the extent of the due diligence performed on Merrill and the breadth and scope of their knowledge of Merrill's condition; yet that position will only tend to prove a key element of the Section 14(a) claims that they should have known the true facts about Merrill and disclosed them in the Merger Proxy Statement.

205.     Fifth, the BOA Director Defendants are unable to objectively consider pursuing these claims, including the ARS-related claims, because, among other reasons:

(a)     **Lewis** is a high-level, highly-compensated executive officer of BOA, and the company has conceded that he is not independent under either the listing standards of the New York Stock Exchange or the company's own Director Independence Standards.  Indeed, The Corporate Library, an independent investment research firm, rated BOA as a "Very High Concern" as a result of Lewis's high pay of almost $30,000,000, and the SEC has written to the company for clarifications in regard to executive compensation levels, including that of CEO Lewis.  Moreover, Lewis, from September 22, 2006 to February 13, 2007, sold approximately 3,122,146 shares of BOA stock for $166,683,200.

(b)     **Gifford**, is a recent, former, high-level, highly-compensated executive officer of BOA that the company concedes is not independent under either the listing standards of

the New York Stock Exchange or the company's own Director Independence Standards. Moreover, Gifford has entered into a highly-paid consulting agreement with BOA that requires the company not only to pay him a retainer, but also to pay for office space, support staff, and a private jet. Indeed, just as Gifford now serves on the Board of BOA as BOA is investigated by regulators in regard to ARS, Gifford also served as the Chairman and Chief Executive Officer of FleetBoston where he, as a member of the FleetBoston Board, approved his own and other executive rewards while FleetBoston was under investigation by regulators for improper trading activities that favored some investors over others. Gifford also was an executive at FleetBoston when FleetBoston, in the wake of its own trading scandal, was acquired by BOA.

(c)     **Bramble** served as a Chief Executive Officer of MBNA and when MBNA was acquired by BOA in 2006. Bramble recently retired from Allfirst Financial Inc. after it was discovered that Allfirst lost $691.2 million in a foreign currency trading scandal, and returned to work only after lucrative offers from MBNA, which BOA continued on his behalf after it acquired MBNA. In connection with the MBNA acquisition, Bramble received an opulent buyout package and a seat on the BOA Board.

(d)     BOA Directors **Barnet, Collins, Countryman, May, and Ryan,** were, like Director **Gifford**, members of the Board of FleetBoston when FleetBoston was under investigation by regulators for improper trading activities that favored some investors over others. When FleetBoston was acquired by BOA in April 2004, these defendants received lucrative buyouts and other compensation and were presented with seats on the BOA Board.

(e)     Each of the BOA Director Defendants has received compensation far in excess of an amount that would render them independent under accepted standards. The

NYSE listing standards, for example, provide that "[a] director who receives . . . more than $100,000 per year in direct compensation from the listed company, other than director and committee fees and pension or other forms of deferred compensation[,] is not independent." Despite these standards, each of the directors received over $100,000 in stock awards alone in both 2006 and 2007. Average compensation over the last two years for several directors has been egregiously disqualifying:  **Lewis** (over $25 million), **Gifford** ($1,616,990) **Spangler** ($576,646), **Ward** ($606,523), and **Massey** ($430,105).

     (f)     At 16 directors, the BOA Board of Directors is large and unwieldy such that it can be and is dominated by **Lewis**, who serves as both the CEO and Chairman and has hand picked the majority of the BOA Board.

     (g)     There is a *100 percent overlap* among two supposedly separate and independent committees of the BOA Board – the Compensation and Benefits Committee and the Corporate Governance Committee. These two committees comprise *exactly the same directors*: **Mitchell, Ryan, Sloan, and Spangler**. These committees have no meaningful distinction from the full BOA Board and exist simply to ratify the positions of the full BOA Board, which is dominated by Lewis, Gifford, and the FleetBoston and MBNA nominees.

     (h)     **Countryman, Gifford, Massey, Sloan, and Ward** also served on the Boards of companies, other than BOA, that received a "D" rating by the Corporate Library.

     (i)     **Gifford, Ward and Mitchell** were the beneficiaries of the full BOA Board's decision to accelerate the vesting of stock options held by these defendants in order to avoid recognizing the related expense.

     (j)     **Ward** serves on the boards of six public companies, three more than would make her a disinterested and independent director under current standards.

(k)    The BOA Board has farmed out its "Lead Director" position to **Sloan**, who is the current Chairman and Chief Executive Officer of General Parts International, Inc., a North Carolina-based distributor of automobile replacement parts.  Sloan cannot, and does not, exercise any independent judgment or control as the Lead Director, as a member of the BOA Board, or as Chair of the Parent's Compensation and Benefits Committee.  Rather, he is dominated and controlled by Lewis, Gifford, and their cohorts from the FleetBoston and MBNA acquisitions (Barnet, Bramble, Collins, Countryman, May, and Ryan).

(*l*)    Each of the five committees of the BOA Board is either chaired by an interested director, or composed of a majority of interested directors, or both:  (i) the Asset Quality Committee is chaired by **Ward**, a highly-compensated director who serves on five other corporate boards; (ii) the Audit Committee is chaired by **May**, a legacy of the FleetBoston acquisition, and composed of a majority of FleetBoston nominees; (iii) the Corporate Governance Committee (chaired by **Ryan**, a FleetBoston legacy) is simply a clone of the Compensation and Benefits Committee (chaired by **Spangler**, who thereby effectively paid herself a million dollars in fees and other cash awards in 2007); and (iv) the Executive Committee is composed entirely of **Lewis**, **Gifford**, **Countryman**, and **Sloan**, chaired by Sloan, whose experience lies in auto parts, not banking.

206.    Each of the BOA Director Defendants was a member of one or more committees of the BOA Board at various times during the Relevant Period and in connection with the Merger.  As members of these Committees, these BOA Directors had specific oversight responsibilities for various aspects of BOA's operations, and each Committee was tasked with reporting back to the full Board.

207.    Each of the BOA Officer Defendants was charged with overseeing the risk, valuation, and integrity of the company's loan portfolios and capital position, and each of the BOA Director Defendants was not only responsible for the company's financial well-being as a whole but also sat on one or more committees of the Board specifically requiring him or her to be actively involved in the oversight of the officers managing the company's portfolio:  (a) **May (Chair), Barnet, Collins, Franks,** and **Massey** (Audit Committee); (b) **Ward (Chair), Bramble, Lozano,** and **Tillman** (Asset Quality Committee); (c) **Sloan (Chair), Mitchell, Ryan,** and **Spangler** (Compensation and Benefits Committee); (d) **Ryan (Chair), Mitchell, Sloan,** and **Spangler** (Corporate Governance Committee); and (e) **Sloan (Chair) Countryman, Gifford,** and **Lewis** (Executive Committee).  Each of these Committees did, in fact, actively direct and control the company's affairs during the Relevant Period. In 2007, the full Board nine times, the Audit Committee met twelve times, the Asset Quality Committee met six times, the Compensation and Benefits Committee met five times, the Corporate Governance Committee met four times, and the Executive Committee met five times.

208.    As members of the Audit Committee of the BOA Board, **May (Chair), Barnet, Collins, Franks, and Massey** had the ultimate responsibility at BOA for both "the effectiveness of the Corporation's system of internal controls" and "the compliance by the Corporation with legal and regulatory requirements."  This mission was encapsulated in the following duties, among others:

- "*Review the scope and content of examinations of the Corporation performed by* the examination forces of the Federal Reserve Board, Comptroller of the Currency, and *other regulatory agencies and report their conclusions to the Board of Directors, including comments as to the suitability of necessary correction action taken, and to the response made to the regulators*";

- *Review with management, the Independent Registered Accounting Firm and the General Auditor any correspondence with regulators or government agencies* and any employee ("Whistleblower") complaints of published reports, *which raise significant issues regarding the Corporation's financial statements or accounting*

*policies, procedures, or controls in accordance with the Committee's established procedures*";

- "Quarterly receive a report on *any significant deficiency or material weakness in the Corporation's internal controls* or any fraud involving an employee associated with internal controls";

- "Annually *review the Corporation's disclosure controls and procedures, including the Corporation's internal controls*"; and

- "Periodically *review with management and the Corporation's General Counsel the nature and status of significant legal matters.*"

(All emphases added.)

209.   The BOA Audit Committee met 12 times during 2007.  The BOA Audit Committee met a similar number of times in 2008.  However, when it came time to consider one of the most important transactions in BOA's history, *viz.*, the acquisition of Merrill, the Audit Committee held no separate meetings and/or failed to ensure that the value of the losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BOA Board.  Thus, these individuals will take no action against Defendants.

210.   As members of the Asset Quality Committee of the BOA Board, **Ward (Chair), Bramble, Lozano, and Tillman** had the ultimate responsibility at BOA for "oversight of credit risks to the company's assets and related earnings."  This mission was encapsulated in the following duties, among others:

- "*review the asset quality trends and performance* of the Corporation and its subsidiaries";

- "*monitor management's adherence to prudent and sound credit policies and practices*"

- "*review credit concentrations, credit risk inherent in selected products and businesses,* and country risk";

- "review the adequacy of the allowance for loan and lease losses and related written policies and procedures"; and

- "*approve credit risk policies and management disciplines* as required by the Basel II accord or other regulatory requirements."

(All emphases added.)

211.    The BOA Asset Quality Committee met six times during 2007.  the BOA Asset Quality Committee met a similar number of times in 2008.  However, with respect to the Merger, the Asset Quality Committee held no separate meetings and/or failed to ensure that the value of the losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BOA Board.  Thus, these individuals will take no action against Defendants.

212.    As members of the Compensation and Benefits Committee of the BOA Board, **Sloan (Chair), Mitchell, Ryan, and Spangler** had the ultimate responsibility at BOA for "overall guidance with respect to the establishment, maintenance and administration of Bank of America Corporation's compensation programs and employee benefit plans."  This mission was encapsulated in the following duties, among others:

- "Determine and approve the compensation, including salary, incentive compensation and equity based awards, for the Chief Executive Officer and Bank of America Corporation's other executive officers";

- "Review and discuss with management the Compensation Discussion and Analysis section of Bank of America Corporation's annual proxy statement and produce the compensation committee report for inclusion in Bank of America Corporation's annual proxy statement"; and

- "Periodically review and make recommendations to the Board as to the form and amount of compensation for Bank of America Corporation's directors."

213.    The BOA Compensation and Benefits Committee met five times during 2007.  the BOA Compensation and Benefits Committee met a similar number of times in 2008.  However, with respect to the Merger, the Compensation and Benefits Committee held no separate meetings and/or

failed to ensure that the value of the losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BOA Board.  Thus, these individuals will take no action against Defendants.

214.    As members of the Corporate Governance Committee of the BOA Board, **Ryan (Chair), Mitchell, Sloan, and Spangler** had the ultimate responsibility at BOA for "matters of corporate governance (defined for this purpose as the relationship of the board, the stockholders and management in determining the direction and performance of the company)" and for "recommend[ing] the corporate governance guidelines, code of ethics, insider trading policy and other corporate governance policies applicable to the company."  This mission was encapsulated in the following duties, among others:

- "solicit and review comments from all directors and report annually to the board with an assessment of the board's performance";

- "periodically review and reassess the adequacy of the company's corporate governance guidelines, code of ethics, insider trading policy and other corporate governance policies and recommend proposed changes to the board for approval"

- "recommend appointments to board committees"; and

- "periodically review and reassess the adequacy of the company's corporate governance guidelines, code of ethics, insider trading policy and other corporate governance policies and recommend proposed changes to the board for approval."

215.    The BOA Corporate Governance Committee met four times during 2007.  the BOA Corporate Governance Committee met a similar number of times in 2008.  However, with respect to the Merger, the Corporate Governance Committee held no separate meetings and/or failed to ensure that the value of the losses and liabilities facing Merrill were adequately considered, valued, and accounted for in recommending approval of the Merger to the BOA Board.  Thus, these individuals will take no action against Defendants.

216.     In addition, while BOA and its public shareholders have suffered substantial damage and losses due to the deceit and deception committed by its insiders and the director oversight failings committed by its Board, the insiders and directors of this Company have not only suffered no damages but, in fact, have greatly profited from their participation in the illegal conduct. These individuals have usurped tens of millions of dollars of regular and bonus compensation, as well as severance payments, stock grants, and stock awards as a result of their incompetent performance and deceptive activities.

217.     As a result of their concealments and falsifications, many of the directors and managers of BOA held onto their positions of power, prestige, and profit at the company.

218.     The BOA Board is still dominated and controlled by wrongdoers who continue to obscure their own misconduct, and will not take action to protect the interests of BOA or its shareholders.  The present Board of Directors of BOA has refused, and will continue to refuse, to institute this action for the foregoing and following reasons:

(a)     The acts complained of herein constitute violations of fiduciary duties owed by the Board of Directors and these acts are incapable of ratification;

(b)     Certain of the known principal wrongdoers and beneficiaries of the wrongdoing complained of herein, including Lewis and Gifford are in a position to, and do, dominate and control the Board of Directors.  Thus, the Board could not exercise independent objective judgment in deciding whether to bring or vigorously prosecute this action;

(c)     The acts complained of herein are illegal and improper and thus are acts incapable of ratification;

(d)     In order to bring this action for breach of fiduciary duty, abuse of control and fraud, the members of the Board of Directors would have been required to sue themselves and/or their fellow directors and allies in the top ranks of the company, who are their good friends and with whom they have entangling financial alliances, interests, and dependencies, which they would not do.  They therefore would not be able to vigorously prosecute any such action;

(e)     The members of the BOA Board, including each of the defendants herein, received substantial salaries, bonuses, payments, benefits, and other emoluments by virtue of their membership on the Board and their control of BOA.  They have thus benefited from the wrongs herein alleged and have engaged therein to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.  The Board members also have close personal or business ties with each other and are, consequently, interested parties and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves; and

(f)     the BOA directors' and officers' liability insurance policies for the relevant period have an "insured vs. insured" exclusion. Thus, if the directors caused the company to sue its officers and directors for the liability asserted in this case they would not be insured for that liability.  They will not do this to themselves or the officers they hired. The directors' and officers' liability insurance was purchased and paid for with corporate funds to protect the company.  This derivative suit does not trigger the "insured vs. insured" exclusion, and thus only this derivative suit can obtain a recovery on the directors' and officers' liability insurance and benefit the company.

IV.     **ADDITIONAL SUBSTANTIVE ALLEGATIONS**

A.      **DUTIES OF THE BOA DEFENDANTS.**

219.    The BOA had stringent duties to BOA and its shareholders.

220.    By reason of their positions as officers, directors, and/or fiduciaries of BOA, and because of their ability to control the business and corporate affairs of the company, the BOA Defendants owed the company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage BOA in a fair, just, honest and equitable manner.  The BOA Defendants were and are required to act in furtherance of the best interests of BOA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

221.    Each director and officer of BOA owes to the company and its shareholders the fiduciary duty to exercise good faith, loyalty, and diligence in the administration of the affairs of the company and in the use and preservation of its property and assets, and to uphold the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the BOA Defendants had a duty to promptly disseminate accurate and truthful information with regard to their company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the company's stock would be based on truthful and accurate information.

222.    The BOA Defendants, because of their positions of control and authority as directors and/or officers of BOA, were able to, and did, exercise control over the wrongful acts complained of herein and over the contents of the various public statements issued by the company.  Because of their advisory, executive, managerial and directorial positions with the company, each of the BOA

Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of the company.

223.    To discharge their duties, the officers and directors of BOA were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the company.  By virtue of such duties, these individuals were required to, among other things:

(i)    refrain from acting in any manner so as to favor the personal interest of the directors or officers of the company at the expense of the best interest of the company and its shareholders;

(ii)    ensure that the company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate information to shareholders, the investing public, and the SEC;

(iii)    conduct the affairs of the company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the company's assets, and to maximize the company's value;

(iv)    properly and accurately guide investors and analysts as to the true financial condition of the company at any given time, including making accurate statements about the company's financial results and prospects, and ensuring that the company maintained an adequate system of financial controls such that the company's financial reporting would be true and accurate at all times;

(v)    ensure that management was conducting legal, fair, and honest transactions with customers, and was not employing artifices or manipulations to maintain so-called "liquid" markets in securities, including ARS, that were not, in fact, liquid;

(vi)    ensure that financial records and asset values were true, accurate and reliable and that such values reflected the real (even if impaired) value of such assets, including ARS;

(vii)   remain informed as to how the company conducted its operations, and, upon receipt or notice of information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws;

(viii)  ensure that the company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations;

(ix)    ensure that sufficient checks and balances in the company's accounting and finance functions, and related functions, were strong enough to prevent accounting irregularities, internal-controls problems, misevaluation of ARS, manipulation of customer orders for ARS, and deception regarding ARS;

(x)     ensure that no inaccurate financial information about the company was released to the public that would tend to artificially inflate the company's stock price, and that would thus cause corresponding or greater harm to the company's value when the truth was revealed; and

(xi)    ensure that valuable corporate assets would not be wasted in payments of excessive bonus payments to executives who ruined the financial health and stability of the company.

224.    Each of the BOA Defendants, by virtue of his or her position as a director and/or officer of BOA, owed the company and to its shareholders the fiduciary duties of loyalty, good faith

and the exercise of due care and diligence in the management and administration of the affairs of the company, as well as in the use and preservation of its property and assets.  The conduct of the BOA Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BOA, the absence of good faith on their part, and a reckless disregard for their duties to the company and its shareholders.

225.     In addition, the BOA Defendants were responsible for maintaining and establishing adequate internal accounting controls for the company and to ensure that the company's financial statements were based on accurate financial information.  According to Generally Accepted Accounting Principles ("GAAP"), to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure.  Among other things, this required these defendants to:  (a) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and (b) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that: (i) transactions are executed in accordance with management's general or specific authorization; and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

226.     The BOA Defendants were aware, or should have been aware, that those violations, absences of good faith, and the reckless disregard of duties posed a risk of serious injury to the company.  The conduct of the BOA Officer Defendants was ratified by the BOA Director Defendants during the Relevant Period.

227.     The BOA Defendants also had specific duties imposed on them by the company.

228.     BOA adopted "Corporate Governance Guidelines" in 2007 to ensure the faithful fulfillment of the codes of conduct and the duties of officers and directors.  Among other things, the

Corporate Governance Guidelines provided that the BOA Director Defendants had "complete and open access to officers and employees of the company. Any meetings or contacts that a director wishes to initiate may be arranged through the CEO or the Secretary or directly by the director." The Guidelines stressed:

> Bank of America's goal in everything we do is reaching for higher standards - for our customers, our shareholders, our associates and our communities, upon which the future prosperity of our company rests. These Guidelines reflect the way we are striving for higher standards in corporate governance.

229.    BOA also had a "Code of Ethics" applicable to the entire Company, including Defendants, which states in part:

> **1.2 Accounting**
>
> To ensure the integrity of its consolidated financial statements, Bank of America has established internal accounting and operating controls and procedures, including disclosure controls and procedures, and a Disclosure Committee.
>
> All associates responsible for the preparation of the corporation's financial statements, or who provide information as part of that process, must maintain and adhere to these controls so that all underlying transactions, both within Bank of America and with third parties, are properly documented, recorded and reported.
>
> In addition, all associates have the responsibility to promote full, fair, accurate, timely and understandable disclosure in reports and documents that Bank of America files with or submits to the Securities and Exchange Commission and in other public communications made by the corporation.
>
> *        *        *
>
> Section 6: Compliance with Law
>
> You must not take any action, either personally or on behalf of Bank of America, which violates any law, regulation or internal policy affecting Bank of America business.
>
> *        *        *

**7.1 Restrictions on trading in Bank of America securities**

You must not buy, sell, recommend or trade in Bank of America securities--either personally or on behalf of someone else--while in possession of material, nonpublic information relating to the corporation, except through trading programs pre-approved by the Legal Department. In addition, you must not communicate or disclose such information to others who may trade in Bank of America securities. Doing so may not only be a violation of your duty to keep such information confidential, but also may be a violation of federal and state laws, and the laws of many countries.

If you are a Bank of America Corporation director or have been designated as an "insider" by the corporation, you must obtain special approvals before trading in Bank of America securities.

230. In addition, the charters of the various Committees of the company's Board also imposed enhanced duties on the Director Defendants sitting on those Committees. These duties are highlighted in paragraphs 208-215, *supra*.

## B. ADDITIONAL DAMAGES TO SHAREHOLDERS FROM ARS MISCONDUCT.

231. As a result of the BOA Defendants' illegal actions and course of conduct during the Relevant Period, the company is now subject to drastically increased costs, both of operating in the normal course, and of satisfying extraordinary obligations incurred as a result of the malfeasance. Such expenditures include, but are not limited to:

(a)   costs incurred in connection with the investigation by the Enforcement Section of the Massachusetts Securities Division, as well as by the New York Attorney General;

(b)   costs incurred in connection with the investigation by the SEC;

(c)   costs incurred in connection with the investigation by other state and/or federal agencies;

81

(d)        costs incurred in connection with defending investor class actions related to these defendants' manipulation of the market for ARS, expected to exceed tens or hundreds of millions of dollars in legal fees and settlement costs;

(e)        costs incurred to correct the company's internal control procedures to remediate material weaknesses in the company's pricing, offering, valuation, sales, trading, and marketing of ARS, as well as the integrity of the division between their research departments and their sales and trading departments;

(f)        increased costs of capital as a result of a lowered share price and a balance sheet encumbered by billions of dollars of illiquid ARS that the companies should never have acquired in the first place;

(g)        potentially hundreds of millions of dollars in settlements to satisfy adverse judgments and/or potential fines in connection with other government investigations;

(h)        costs incurred from increased Directors and Officers' Insurance ("D&O Insurance") premiums as a result of the manipulation of the ARS market;

(i)        costs incurred from potential losses of large trading partners who do not want to be associated with brokerages that improperly manipulate markets for securities they sell to customers, improperly fuse their Research and Sales & Trading operations; and lie about the liquidity of the securities they sell and their willingness to support the market for those securities; and

(j)        costs of downgrades of the company's debt and securities by financial analysts and creditors, due to concerns about the accuracy and integrity of the companies' financial practices and reporting.

## V.      CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION.

232.      At all relevant times, as a result of their membership on the Board of Directors, various Committees of the Board, and/or senior management of the company, as well as the powers available to each of them as a result of these memberships, each of the BOA Defendants had access to internal corporate documents, conversations, and connections with other corporate officers and employees, attended management and Board meetings, and committees thereof, and was provided with reports and other information about the company prior to their public dissemination.  Similar access was enjoyed by the Merrill Defendants with respect to Merrill's internal affairs.  Moreover, after the Merger was announced, the BOA Director Defendants had complete access to similar information concerning Merrill.

233.      Accordingly, and because of their positions of trust, loyalty, and fidelity to BOA, the BOA Defendants and the Merrill Defendants should have known:  (a) the adverse, material information about the business of Merrill and BOA that they failed to disclose to the investing public, which subjected the company to lawsuits by and ultimately huge damages paid to shareholders; (b) the nature of their fiduciary duties to BOA, including the duties that the company required of them, and their active breach of those very same duties; (c) the absence of any meaningful internal controls and procedures that would have prevented the BOA Defendants' manipulation of the market for ARS, their deception of its own customers, and the company's resulting exposure to government investigations, lawsuits, and the need to repurchase or otherwise carry billions of dollars of unmarketable ARS on its books; and (e) the conflicts of interests among themselves which caused the BOA Defendants to act in their own self-interest and contrary to the interests of BOA.

234.     At all relevant times, the BOA Defendants individually and collectively engaged in a course of conduct that was consciously designed to and did:  (a) enhance the BOA Defendants' directorial and managerial positions at BOA, as well as the power and prestige accruing to the BOA Defendants as a result of holding those positions; (b) transfer exorbitant unearned and wasteful sums of money to themselves; (c) expose BOA to civil and criminal liability for the BOA Defendants' conscious manipulation of the ARS market, and their deception of company customers; (d) expose the company to government investigations, lawsuits, and the need to repurchase or otherwise carry billions of dollars of essentially worthless ARS on its books; (e) conceal the fact that the company was grossly misrepresenting its financial results in order to allow the BOA Defendants to hide the company's liability arising from the manipulation of the ARS market at least long enough to allow certain of the BOA Defendants to pay themselves enormous bonuses for 2007; (f) otherwise deceive the investing public, including BOA's own shareholders, as to the Merrill Defendants' management of Merrill's operations, the company's financial health, stability, the accuracy and integrity of its accounting policies and other internal controls, and its business prospects; (g) expose the company to massive damages and incalculable reputational loss among its actual and potential customers and investors; and (h) purchase Merrill for BOA without adequate due diligence, and through the mechanism of a false and misleading Merger Proxy Statement.

235.     In committing the wrongful acts alleged herein, the BOA Defendants, the Merrill Defendants, and the Advisor Defendants pursued, or joined in the pursuit of, a common course of conduct, and acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the BOA Defendants and the Merrill Defendants further aided, abetted, and/or assisted one another in breaching their respective duties.  The Merrill Defendants aided and abetted the BOA Defendants

in their breaches of duty with respect to the Merger and their filing of a false and misleading Merger Proxy Statement.

236.    At all relevant times, each of the BOA Defendants was the agent of each of the other BOA Defendants, and was at all times acting within the course and scope of such agency.  At all relevant times, the BOA Director Defendants, the Merrill Defendants, Price, and the Advisor Defendants was the agent of each of the others, and was at all times acting within the course and scope of such agency.

237.    Each of the Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of the wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

238.    The Merrill Defendants engaged in a conspiracy, common enterprise and/or common course of conduct to make improper statements about Merrill's financial performance, and its future business prospects.  The BOA Director Defendants and the Advisor Defendants joined in and supported the Merrill Defendants' conspiracy and common enterprise with respect to the Merger.

239.    The purpose and effect of the BOA Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the BOA Defendants' violations of federal and state law, breaches of fiduciary duty, and unjust enrichment; to conceal adverse information concerning the company's and BOA's operations, financial condition and future business prospects; and to artificially inflate the price of BOA common stock so they could, among other things: (i) usurp tens of millions of dollars in unearned bonus, salaries, stock awards, and other

emoluments, and (ii) protect and enhance defendants' executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

## VI.    DERIVATIVE ALLEGATIONS.

240.    Plaintiffs bring these claims derivatively in the right and for the benefit of BOA to redress injuries suffered by it as a direct result of the breaches of fiduciary duty, dissemination of a false and misleading Merger Proxy Statement, and other wrongs committed by the BOA Defendants. BOA is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

241.    Plaintiff will adequately and fairly represent the interests of BOA in enforcing and prosecuting its rights.

242.    Plaintiff was an owner of BOA common stock during the wrongs complained of, and remains so now.

243.    Prosecution of this action, independent of the BOA Board, is in the best interests of BOA.

### CLAIMS FOR RELIEF

### COUNT I

**Derivatively Against the BOA Defendants for Breach of Fiduciary Duties**

244.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

245.    The BOA Defendants owed and owe BOA fiduciary obligations.  By reason of their fiduciary relationships, the BOA Officer Defendants and the BOA Director Defendants owed and owe BOA the highest obligation of good faith, fair dealing, loyalty, oversight, and due care.

246.    The BOA Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision.  Each of these defendants

had actual or constructive knowledge that the BOA Defendants had caused the company to manipulate the market for ARS, deceive its own customers, become exposed to government investigations, lawsuits, and the need to repurchase or otherwise carry tens of billions of dollars of essentially worthless ARS on its books, and mislead shareholders.

247.    The BOA Defendants consciously failed to implement an effective system of internal controls over its ARS marketing and trading operations and/or consciously failed to oversee the operations of such control systems.

248.    The BOA Defendants knowingly caused or allowed the company's financial statements to be materially misstated due to the BOA Defendants' knowing pretense that the market for ARS was liquid.

249.    The BOA Defendants failed in good faith to supervise, and to exert internal controls over, and consciously disregarded responsibilities involving the company's trading and marketing operations of ARS securities.

250.    The BOA Defendants also knowingly caused BOA's financial statements during the Relevant Period to be materially misleading and not prepared in accordance with GAAP principles.

251.    In addition, the BOA Director Defendants breached their duties to BOA and its shareholders by causing or allowing BOA to grant indemnifications to the Merrill Defendants for liabilities arising before the Merger was consummated, including but not limited to ARS-related liabilities, and by failing to detect or give consideration to the massive losses and liabilities facing Merrill.  The BOA Director Defendants devoted no process or deliberation whatsoever to the decision to grant indemnification, and the due diligence they gave to the decision to purchase Merrill was inadequate.  Such conduct could not have been the result of rational business judgment.

252.     As a direct and proximate result of the BOA Defendants' failure to perform their fiduciary obligations, BOA has sustained significant damages.  As a result of the misconduct alleged herein, each of the BOA Defendants is liable to the company.

## COUNT II

### Derivatively Against the BOA Officer Defendants for
### Unjust Enrichment and Return of Unearned Compensation

253.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

254.     The BOA Officer Defendants were eligible for incentive compensation premised upon their achievement of BOA's business and financial goals in a legitimate and lawful manner. Each of the BOA Officer Defendants received substantial incentive compensation payments.

255.     By reason of their positions as officers of BOA, the BOA Officer Defendants owed fiduciary duties to the company and its shareholders in connection with the operation, management, and direction of the company.

256.     The BOA Officer Defendants failed to achieve BOA's business and financial goals except in an illegitimate and unlawful manner.  Accordingly, the compensation payments to the BOA Officer Defendants were not properly awarded for the work performed and results achieved. Since these defendants did not obtain the business results expected, they have been unjustly enriched and must return to the company the incentive compensation that was awarded to them.

## COUNT III

### Derivatively Against the BOA Defendants for Contribution

257.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

258.     The conduct of the BOA Defendants has exposed BOA to significant liability under various federal and state laws.

259.     By reason of the foregoing, the BOA Defendants have caused BOA to suffer substantial harm.

260.     If BOA is held liable under federal or state laws for damages, civil penalties, restitution, or other relief, the BOA Defendants are liable to BOA for contribution.

261.     Plaintiff has no adequate remedy at law.

### COUNT IV

### Derivatively Against the BOA Defendants for Breach of the Duties of Full Disclosure and Complete Candor

262.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

263.     Whenever directors or officers of a public corporation communicate with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith, and loyalty.  The *sine qua non* of all such communications to shareholders is honesty.  Moreover, a fiduciary who learns that his or her earlier communications to his or her beneficiaries were false or misleading, and nonetheless knowingly and in bad faith remains silent even as the beneficiaries continue to rely on those earlier statements, also breaches his or her duty of loyalty and of full and fair disclosure.

264.     Each of the BOA Defendants breached his or her duty of full disclosure and complete candor by knowingly and/or recklessly disregarding the falsity and misleading nature of the information which they caused to be disseminated to shareholders.

265.     In addition to the duties of full disclosure imposed on the BOA Defendants as a result of their making affirmative statements and reports, each of these defendants had a duty to

disseminate truthful information promptly that would be material to a reasonable investor in compliance with the integrated disclosure provisions of the SEC regulatory regime, including accurate and truthful information with respect to BOA's business, so that the market prices of the company's public traded securities would be based on accurate, truthful, and complete information.

266.     As a direct and proximate result of the BOA Defendants' breaches of their duties of full disclosure and complete candor, BOA sustained significant damages arising out of the material misstatements to shareholders, and the BOA Defendants are liable to the company.

## COUNT V

### Derivatively Against the Merrill Defendants for
### Aiding and Abetting the BOA Director Defendants' Breach of Fiduciary Duties

267.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

268.     The BOA Director Defendants owed BOA fiduciary obligations.  By reason of their fiduciary relationships, the BOA Director Defendants owed BOA the highest obligation of good faith, fair dealing, loyalty, oversight, and due care.  That the BOA Director Defendants owed these duties to BOA was well known to the Merrill Defendants.

269.     As is detailed in the preceding paragraphs, the BOA Director Defendants have breached their fiduciary duties to BOA.

270.     The Merrill Defendants aided and abetted the BOA Director Defendants' breaches of fiduciary duty.  The Merrill Defendants actively and knowingly induced the BOA Director Defendants to breach their fiduciary duties by offering a Merger transaction to BOA which would cause BOA to indemnify the Merrill Defendants and to assume billions of dollars in undisclosed losses and liabilities, to the detriment of BOA and its shareholders.

271. Moreover, the Merrill Defendants concealed the fact of Merrill's growing losses and liabilities from the BOA Director Defendants and actively worked to prevent them from discovering the true facts. Among other things, the Merrill Defendants convinced the BOA Director Defendants that Merrill's growing losses were "market related" and "in line" with other Wall Street firms, and they told the BOA Director Defendants that Merrill's exposure was the result of "legacy" trading positions and not new positions that had been put on by defendant Montag since the deal was announced on September 15, 2008.

272. BOA was harmed as a direct and foreseeable consequence of the Merrill Defendants' misconduct. As a result of the misconduct alleged herein, each of the Merrill Defendants is liable to BOA.

273. Plaintiffs have no adequate remedy at law.

## COUNT VI

**Derivatively Against the Merrill Defendants, the BOA Director
Defendants, Price, and the Advisor Defendants for Violation of
Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder**

274. This claim for relief, Count VI, is not based on any allegations of knowing or reckless conduct by any defendant. This claim does not allege, and does not sound in, fraud, and Plaintiff disclaims any reliance upon or reference to allegations of fraud.

275. Plaintiff incorporates by reference and realleges the allegations contained in paragraphs 16-20 and 154-198 above, as though fully set forth herein.

276. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), provides that "[i]t shall be unlawful for any person, by the use of the mails or by any means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or

for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this tile [15 U.S.C. § 781]."

277.    SEC Rule 14a-9, promulgated pursuant to Section 14(a), prohibits the issuance of any proxy statement "which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."  17 C.F.R. § 240.14a-9(a).

278.    In the Merger Proxy Statement, Plaintiff and all other BOA shareholders were solicited to vote to approve the Merger between BOA and Merrill.  A shareholder vote was required to approve this proposal.  Thus, the Merger Proxy Statement was an essential causal link in the accomplishment of this proposal.

279.    The Merrill Defendants, the BOA Director Defendants, Price, and the Advisor Defendants provided information which was contained in the Merger Proxy Statement, allowed their names to be used in connection with the Merger Proxy Statement and the solicitation of shareholder votes, had a substantial financial interest in the outcome of the votes being sought by the Merger Proxy Statement, would have a continuing material relationship with BOA following the vote on the Merger and other issues presented in the Merger Proxy Statement, solicited votes under the Merger Proxy Statement, and caused the Merger Proxy Statement to be disseminated to BOA's shareholders through the use of the United States mails and the means and instrumentalities of interstate commerce.

280.     The Merrill Defendants, the BOA Director Defendants, Price, and the Advisor Defendants solicited proxies from the Plaintiff and other BOA shareholders by means of a proxy statement which contained false and misleading statements concerning the Merger, its benefits to shareholders, and other issues, and which omitted to state material facts that were necessary to make the statement contained therein not false and misleading.

281.     The Merger Proxy Statement dated October 31, 2008, jointly issued by BOA and Merrill, and the supplemental filings and disseminations made by the defendants named herein in advance of the shareholder vote on the Merger on December 5, 2008, were false and misleading in light of the true financial condition of Merrill, and the combined BOA/Merrill, including in particular the existence of substantial losses related to ARS and other securities that were first disclosed only on January 16, 2009, long after the Merger had closed.  These defendants in the exercise of reasonable care should have known the truth about Merrill's deteriorating financial condition and the existence of the losses by at least December 5, 2009, but failed to disclose such information, by supplementing the Merger Proxy Statement or otherwise, before shareholders voted.

282.     The misrepresented or omitted facts are material because under all the circumstances, there is a substantial likelihood that a reasonable shareholder would consider the false and misleading statements or omitted facts important in deciding how to vote on the Merger Proxy Statement or a material part of the mix of information available to shareholders in deciding how to exercise their voting rights.  Thus, shareholders were denied the opportunity to make an informed decision in voting on the Merger.

283.     None of the materially false and misleading statements contained in the Merger Proxy Statement, or material facts omitted therefrom, were known to Plaintiff or other BOA shareholders

when they voted on the matters presented to them in the Merger Proxy Statement on December 5, 2008.

284.    BOA was harmed and suffered damages as a result of the Merger which was approved through the use of a proxy statement in violation of Section 14(a) and Rule 14a-9.

285.    As a consequence of the foregoing, BOA has been damaged.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiffs demand judgment as follows:

A.    Against all the BOA Defendants and in favor of BOA for the amount of damages sustained by BOA as a result of the BOA Defendants' breaches of fiduciary duties, unjust enrichment, contribution, and violations of the federal securities laws;

B.    Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the BOA Defendants' assets until BOA can recoup all of the monies improperly transferred to the BOA Defendants;

C.    Declaring that the BOA Defendants' improper payments to themselves through BOA's coffers of unearned bonuses, compensation, stock awards, fees, and other illicit transfers – as well as any assets or property acquired with such payments – be held in constructive trust for the benefit of BOA;

D.    Awarding to BOA restitution from the BOA Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other monies obtained by the BOA Defendants;

E.    Directing BOA to take all necessary actions to reform and improve its corporate governance and internal procedures regarding the pricing, offering, valuation, sales, trading, and marketing of ARS, as well as the integrity of the division between its

research departments and its sales and trading departments, so as to comply with applicable laws and to protect BOA and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to BOA's by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance policies:

> (i)      strengthening the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

> (ii)     controlling and limiting improper payments of unearned compensation, corporate benefits, stock awards, and other emoluments;

> (iii)    permitting shareholders to nominate at least three additional candidates for election to the Board;

> (iv)     appropriately testing and then strengthening the internal audit and control functions demanded herein;

> (v)      establishing enhanced minimum qualifications for members of the committees of the Board which have oversight of ARS, regulatory affairs, and the relationship of the research department to the sales and trading department;

> (vi)     establishing a committee of the Board charged with monitoring and minimizing the risk to the company and/or its Parent from activities in various types of derivative securities, such as ARS, whose volatility or liquidity might create financial issues for BOA, or its trading partners or customers, or damage its reputation;

(vii)    erecting an unbridgeable ethical wall between the Research Department and the Sales & Trading and other departments at the company which generate revenue from the sale of securities analyzed by the Research Department, precluding employees of the Sales & Trading and other departments from influencing the content of the Research Department's reports;

(viii)   reforming company compensation policies so as to preclude the payment of any compensation to Research Analysts which would encourage the analysts to provide other than objective reports which reflect the honest assessments of the analysts to the best of their knowledge, information, and belief; and

(ix)    preventing BOA from underwriting or selling any new derivative securities without adequate safeguards that such securities will trade in a liquid market without the need for supportive or manipulative activities by the company that violate company policies, ethical norms, industry standards, or federal or state securities laws;

F.    Directing BOA to take all necessary actions to reform and improve their corporate governance and internal procedures regarding acquisitions, including, but not limited to, putting forward for shareholder vote resolutions for amendments to BOA's by-laws or articles of incorporation and taking such other action as may be necessary to place before shareholders for a vote the following actions and policies:

(i)    providing that all material information concerning any mergers or acquisitions, including any such information calling into question the appropriateness of proceeding with any such transaction, will be communicated to shareholders as soon as it is received, regardless of whether a shareholder vote has been completed;

(ii)      providing that no merger or other acquisition can be approved by the Board of Directors for recommendation to shareholders until the earlier of (x) the passage of five business days from the first communication of a potential transaction made to or received from a potential merger or acquisition partner, or (y) the Board's receipt of an opinion of outside, independent legal counsel, specifically retained for that purpose, that, in the circumstances presented, the time and scope of the due diligence performed by the company and presented to the Board was adequate to make an informed decision to recommend approval of the transaction;

(iii)     providing that, with respect to any substantial merger or acquisition, an outside, independent legal counsel, specifically retained for that purpose, be appointed to represent shareholders to monitor the progress of the transaction from the date of recommendation of shareholder approval by the Board to the closing date; and

(iv)     terminating the employment of Lewis.

G.      A judgment declaring the Merger Proxy Statement to be materially false and misleading in violation of Section 14(a) of the Exchange Act;

H.      Awarding Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  January 27, 2009

KAHN GAUTHIER SWICK, LLC

By:_____

Lewis S. Kahn
*lewis.kahn@kgscounsel.com*
Albert M. Myers (a member of the bar of this Court)
*albert.myers@kgscounsel.com*
Kevin Oufnac
*kevin.oufnac@kgscounsel.com*
650 Poydras Street, Suite 2150
New Orleans, LA 70130
Telephone: (504) 455-1400
Fax:  (504) 455-1498

Michael Swick (a member of the bar of this Court)
12 East 41st Street—12th Floor
New York, NY 10017
Telephone: (212) 696-3730
Fax:  (504) 455-1498

*Attorneys for Plaintiff the Louisiana Municipal Police
Employees Retirement System*

**VERIFICATION**

I, Albert M. Myers, aver under penalty of perjury of the United States that, as counsel for plaintiff Louisiana Municipal Police Employees Retirement System, I have reviewed the foregoing Shareholder Derivative Complaint, and that the allegations are true and correct to the best of my knowledge and belief.

_____

Albert M. Myers

Judge Berman

**U8 CIV 10753**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|   |   |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| Plaintiff, : | ΣϹϜ ϹΛ$Σ |
| v. : | Civil Action No. |
| CITIGROUP GLOBAL MARKETS, INC. : | RECEIVED
DEC 1 1 2008
U.S.D.C. S.D. N.Y.
CASHIERS |
| Defendant. : | |

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission") alleges the

following against Defendant Citigroup Global Markets Inc. ("Citi" or "Defendant"):

**NATURE OF THE ACTION**

1.      This is a case in which the Defendant misled tens of thousands of its customers

regarding the fundamental nature and increasing risks associated with auction rate

securities ("ARS") that Citi underwrote, marketed and sold. Through its financial

advisers ("FAs"), sales personnel, and marketing materials, Citi misrepresented to

customers that ARS were safe, highly liquid investments comparable to money market

instruments. As a result, numerous customers invested in ARS funds they needed to have

available on a short-term basis.

2.      Citi historically had committed it own capital to support ARS auctions for which

it served as the lead manager so that those auctions did not fail. During the fall of 2007,

the credit crisis and deteriorating market conditions caused Citi to have to support its

auctions to a greater extent. Citi knew the ARS market was deteriorating and Citi's

1

inventory of ARS was significantly increasing. Accordingly, Citi knew the risk of failed auctions had materially increased. Citi knew these material facts but did not disclose to its customers timely, complete, and accurate information about them.

3.      In mid-February 2008, Citi decided to stop supporting the auctions. On February 11, 2008, Citi stopped supporting its student loan ARS auctions, and those auctions failed. On February 12, 2008, Citi stopped supporting its auctions for other ARS with low maximum rate resets, and those auctions failed. As a result of failed auctions, tens of thousand of Citi customers held approximately $45 billion of illiquid ARS, instead of the liquid short-term investments Citi had represented ARS to be.

4.      By engaging in the conduct described in the Complaint, the Defendant violated Section 15(c) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78o(c)]. Accordingly, the Commission seeks: (a) entry of a permanent injunction prohibiting the Defendant from further violations of the relevant provision of the Exchange Act; (b) the imposition of a civil penalty against the Defendant; and (c) any other relief this Court deems necessary and appropriate under the circumstances.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to Sections 21(d)(1), 21(e), 21(f), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(e), 78u(f), and 78aa].

6.      Citi, directly or indirectly, used the mails and means and instrumentalities of interstate commerce in connection with the acts, practices, and courses of business alleged herein.

7.     Venue is appropriate in this District pursuant to Section 27 of the Exchange Act because Citi is found, has its headquarters and principal executive offices, and transacts business in this District.

## DEFENDANT

8.     Citigroup Global Markets Inc., a wholly-owned brokerage and securities subsidiary of Citigroup Inc., is incorporated and has its headquarters, principal executive offices, and short-term trading desk in New York, New York. Citigroup Global Markets is registered with the Commission as a broker-dealer. Among other services, Citi provided underwriting services for issuers of ARS and marketed ARS to retail and other customers located throughout the United States.

## FACTUAL ALLEGATIONS

### Description Of ARS

9.     ARS are bonds issued by municipalities, student loan entities, and corporations, or preferred stock issued by closed-end mutual funds, with interest rates or dividend yields that are periodically reset through frequent auctions, typically every seven, fourteen, twenty-eight or thirty-five days. ARS are usually issued with maturities of thirty years, but the maturities can range from five years to perpetuity.

10.     The issuer of each ARS selects one or more broker-dealers to underwrite the offering and/or manage the auction process. If the issuer selects more than one broker-dealer, then the issuer designates one of the broker-dealers as the lead broker-dealer, which is primarily responsible for managing the auction process. Customers can only submit orders for that ARS through the selected broker-dealers.

3

11.     Each participating broker-dealer accepts orders from its customers, as well as from non-participating broker-dealers, and then submits the orders to the auction agent, which runs the auction. Customers bid the lowest interest rate or dividend they are willing to accept. The auction clears at the lowest rate bid that is sufficient to cover all of the securities for sale, and that rate applies to all of the securities in the auction until the next auction. If there are not enough bids to cover the securities for sale, then the auction fails. If an auction fails, then the issuer pays a maximum rate, which either is a pre-determined flat rate or a rate set by a pre-determined formula described in the disclosure documents. The maximum rate may be higher or lower than the prior auction rates or the rates available on similar securities of similar credit quality and duration in the market place.

### Citi's Role In The ARS Market

12.     Citi marketed ARS to public and private issuers as an attractive way to obtain financing. ARS are long-term obligations that re-price frequently using short-term interest rates, which typically are lower than long-term rates.

13.     Citi marketed ARS to customers as an investment that offered "[c]ompetitive short-term interest rates compared with other money market instruments."

14.     For certain ARS, Citi was the sole or lead broker-dealer. Citi's practice, as was the practice of other broker-dealers participating in the ARS market, was to submit cover or support bids in all auctions for which it was the lead broker-dealer so that the auctions would not fail.

15.     If Citi's cover bid was "hit," then Citi would purchase for its inventory the amount of ARS necessary to prevent a failed auction. Citi tried to sell the inventory in

4

the secondary market between auctions and submitted sell orders for any ARS it still held at the next auction.

16.    Citi received a fee from ARS issuers for underwriting the ARS offering. Citi also received an annual fee from ARS issuers for remarketing the ARS. For ARS that it placed with customers or held in inventory, Citi received higher fees than for other short-term instruments.

### Citi Marketed ARS As Money Market Alternatives

17.    Through its FAs and sales personnel, Citi marketed ARS to its customers as money market alternatives and liquid investments that could be liquidated at the customer's demand on the next auction date. As a result, some customers invested in ARS funds that they might need for short-term requirements, such as for a down payment on a house, medical expenses, college tuition, or taxes. In many cases, Citi did not adequately advise these and other customers that, under certain circumstances, any funds invested in ARS could become illiquid, possibly for long periods.

18.    Monthly account statements sent to Citi customers listed certain types of ARS under the heading "money market and auction instruments." These characterizations could have caused customers who received such statements to reasonably believe that the safety and liquidity features of their ARS investments were similar to those of other money market instruments.

19.    Citi's association of ARS with money market alternatives was misleading because of the illiquidity risks associated with ARS.

**Citi's Disclosures Did Not Negate Citi's Misleading Marketing of ARS**

20.    Citi posted its ARS practices and procedures on its website, but these disclosures

were inadequate and did not negate Citi's marketing of ARS as liquid investments that

were an alternative to money market instruments.

21.    According to Citi's practices and procedures, "From an investor's

perspective,…ARS are generally viewed as an alternative to money market funds."

22.    Citi had disclosures relating to, among other things, an "Existing Holder's Ability

to Resell Auction Rate Securities May be Limited" that stated in part:

> Existing holders will be able to sell the ARS in an auction only if there are bidders
> willing to purchase all the ARS offered for sale in the auction. If sufficient
> clearing bids have not been made, existing holders that have submitted sell orders
> will not be able to sell in the auction all, and may not be able to sell any, of the
> ARS subject to such submitted sell orders. … Citigroup may submit a bid in an
> auction to keep it from failing, but it is not obligated to do so. There may not
> always be enough bidders to prevent an auction from failing in the absence of
> Citigroup bidding in the auction for its own account. Therefore, failed auctions
> are possible, especially if the issuer's credit were to deteriorate, if a market
> disruption were to occur or if, for any reason, Citigroup were unable or unwilling
> to bid.

Citi's disclosures regarding auction failures, however, were inconsistent with its

description of ARS as "an alternative to money market funds" and inconsistent with its

marketing of ARS as liquid, short-term investments.

23.    In addition, Citi did not disclose the extent to which the liquidity of ARS

depended upon Citi bidding in the auctions. Citi used its support of auctions, and

corresponding record of no failed auctions, to imply safety and liquidity in promoting its

ARS to certain customers. Consequently, even if a customer had been informed that

there were liquidity risks associated with ARS, the customer would not know that that the

liquidity risk, to a significant degree, depended upon Citi's discretion to bid to support auctions.

24. Moreover, Citi did not take adequate steps to adequately ensure that its FAs and sales personnel were aware of Citi's practices and procedures and/or aware that auctions could fail and render the ARS illiquid. At least some FAs and sales personnel did not know this information, and, consequently, did not provide this information to customers. As a result, many Citi customers indicated that they understood from their FAs that ARS were short-term, liquid instruments to manage their cash.

### Citi Knew Or Was Reckless In Not Knowing That Its FAs And Sales Personnel Marketed ARS To Customers As Money Market Alternatives And Did Not Adequately Disclose The Risks Associated With These Securities

25. Citi was aware that its FAs and sales personnel marketed ARS to customers as liquid investments and money market alternatives.

26. In August 2007, when concerns about ARS were heightened at Citi, internal documents provided to senior management discussed the implications if Citi were to stop supporting auctions. The documents stated, "Investors and issuers might believe that there is implied liquidity provided by Citi because we have marketed the fact that we have never had a failed auction as lead manager in twenty years," and also identified the risk of lawsuits. Short-Term Trading management also discussed the implications in a separate document: "Implied liquidity: bankers, salespeople and trades have implied the concept of liquidity provided by Citi for investors and issuers for over 20 years." The document also identified "a risk of lawsuits initiated by thousands of retail investors, high net worth clients and institutional clients because Auction Rate Securities (ARS) have

7

been marketed as 'money market alternatives' and 'liquid investments' for 20 years. The hundreds of ARS issuers may also seek litigation against Citi."

27.     Senior managers received an internal presentation, dated November 1, 2007, that stated, "Investors purchase ARS as a high-yielding money market alternative to CP [commercial paper] and CD's."

28.     Moreover, Citi was aware that at least some customers in ARS were unsophisticated investors.

29.     Citi also was aware that many of its customers did not understand the liquidity risks associated with ARS, including that ARS are long term securities without assured liquidity other than through the auction process.

### Citi Failed To Disclose That, By Late 2007, Citi's Ability To Support Auctions Was Impaired

30.     Prior to February 2008, Citi had supported its ARS auctions, and, consequently, had never had a failed auction since it began marketing ARS in the 1980s.

31.     Historically, Citi's inventory from supporting auctions ranged from approximately $1 to $2 billion, and this amount of ARS inventory was within the balance sheet limit that Citi had set as the amount of capital resources that Short-Term Trading could use to purchase the ARS necessary to prevent failed auctions. Accordingly, Citi historically was willing and able to support its ARS auctions. That situation began to be stressed in August 2007.

32.     By August of 2007, the credit crisis had created significant balance sheet stress for Citi, as well as for other financial services firms. This balance sheet stress affected Citi's ability to purchase additional assets, including ARS, because Citi would have had to use its capital resources for the purchase. At the same time, the ARS market was

deteriorating. In mid-August, an internal email stated that "there are definitely cracks forming in the market. Inventories are starting to creep higher in the market and failed auction frequency is at an all time high."

33.    Beginning in August 2007, as Citi increasingly had to purchase ARS inventory to prevent failed auctions, the dollar amount of Citi's ARS inventory reached the internal balance sheet limit that Citi had set for its ARS inventory.

34.    Short-Term Trading management, and the heads of banking units that underwrite ARS, realized that without an increase to the inventory limit set for ARS, Citi could not purchase the ARS necessary to continue to support the auctions and auctions would fail. Consequently, on August 16, 2007, Short-Term Trading management emailed senior management, "We need to discuss the current state of the auction rate market, our commitment to the auctions, its impact on our balance sheet and the effect of our actions on our clients…our actions will have broad-reaching implications to all of our constituents, the market, and our franchise."

35.    On August 19, 2007, Short-Term Trading management outlined the ramifications if Citi allowed widespread failed auctions, including the "implied liquidity" and risk of lawsuits by customers who had been marketed ARS as "money market alternatives" and "liquid investments" for 20 years," discussed previously. These general points were included in a document provided to more senior managers the next day.

36.    The balance sheet limit for ARS ultimately was increased, and Citi continued to support auctions. The balance sheet limit had to be increased additional times throughout the fall of 2007 and beginning of 2008 to accommodate Citi's ARS inventory as it

9

increased from approximately $4 billion to more than $10 billion in February 2008 when Citi stopped supporting auctions.

37. As early as August 2007, Citi recognized that the amount of available ARS exceeded the demand, but Citi continued to increase the amount of ARS that Citi underwrote and marketed, thereby contributing to the inventory and balance sheet problems that threatened its ability to continue supporting auctions. For instance, Citi still explored opportunities to take over ARS from other broker-dealers as those broker-dealers struggled in the deteriorating market. Citi investment bankers also wanted to continue bringing new ARS to market, to earn fees and to maintain their position vis-à-vis bankers at other broker-dealers, despite the need to control the supply and inventory of ARS. Not until early November 2007 did Citi finally curtail new ARS issuances for the year.

38. As the fall of 2007 passed and the likelihood of failed auctions significantly increased, Citi did not provide current, complete, and accurate information to its customers to make them aware of this increased risk.

39. Citi knew that its ARS were marketed to institutional and retail customers, and that retail customer participation was essential to the success of the ARS market. Citi also knew or was reckless in not knowing that its retail customers expected liquidity on demand and that Citi-managed auctions historically had provided that liquidity. As Citi's ARS inventory grew in late 2007, diminishing Citi's ability to continue providing liquidity, Citi failed to ensure that new or existing customers were advised of these risks associated with buying or holding ARS.

10

### Citi Increased Its Efforts To Sell Its Growing Inventory
### As It Continued To Try To Support ARS Auctions

40.     As Citi's ARS inventory grew, Citi increased its efforts to sell the inventory.

41.     For example, on August 30, 2007, an email to ARS traders stated, "Make sure you don't leave any stones unturned today. We are currently at our extended limit. Hit all bids....Times like these, we need to do whatever is necessary. Just make sure all hands are on deck and paper is sold."

42.     Although commissions for selling ARS were among the highest for short-term products, in early November 2007, Citi raised its commission to FAs for seven-day municipal ARS from twenty to twenty-five basis points. Although this increase impacted approximately 25% of the ARS auctioned through Citi, these ARS were primarily purchased by retail customers. The email to FAs alerting them of the increase stated, "The risks for all ARS remain the same." In contrast, an internal memorandum explained that the increased commissions were to "help to move increasing inventory while capital is sparse," "assist in managing another large year of new issuance distribution," "make[] the product more attractive relative to other options," and "answer[] the call of banking and management to find additional methods to augment distribution."

43.     Citi also took steps to sell its inventory of ARS to customers by offering discounts and other promotions. For example, in mid-December, Citi offered certain ARS to customers with as much as six days of interest free. The offer meant that customers did not have to pay for the inventory until six days after the auction but received the interest on the ARS as if the customers had held the ARS for the entire period. Citi lost money on ARS after two days of free interest.

11

44.     In early January, Citi raised some of the fees for other broker-dealers that sell

Citi's ARS: subordinate ARS increased from ten to twenty basis points, and all other

auction products, excluding seven-day municipal debt, increased from ten to fifteen bps.

45.     Even during the days leading up to when Citi allowed auctions to fail, Citi still

was trying to sell inventory.  An email instructed ARS traders and others to "sell anything

you can" and "if there is an opportunity to reduce our book, then we have to hit it

ASAP."

### Citi Failed To Disclose To Customers That Certain ARS Had Low Maximum Rate Resets And That It Was Supporting ARS That Were Not "Viable" Structures In The Deteriorating Market

46.     When Citi discussed the possibility of failed auctions, Citi often stated that ARS

have high, above market, maximum rate resets if an auction failed to compensate the

holder for the lack of liquidity and to create incentives for the issuer to restructure the

ARS, thereby providing liquidity to the holder.  Citi failed to disclose that, at least under

market conditions at that time, certain ARS had low, below market, maximum rate resets.

47.     Certain types of ARS, such as certain classes of municipal ARS, did have fixed

maximum rate resets as high as fifteen or twenty percent, and, thus, well above market

rates for instruments of similar credit quality and duration.  In contrast, however, other

ARS, such as Student loan ARS (which Citi generally did not sell to retail customers) and

preferred ARS issued by closed-end funds (which Citi sold to institutional and retail

customers), had formulaic maximum rate resets that were determined by reference to

certain market indices.  At least since August 2007, these market indices were generally

low, so the formulas for certain ARS resulted in reset rates lower than the rates set in

auctions, and, thus, a rate below market rates for instruments of similar credit quality and duration.

48.     For example, in a presentation in the fall of 2007 specifically on student loan ARS, most of which had low formulaic maximum rate resets, Citi stated that "the failed auction rate is intended to be a punitive level for the issuer and to compensate the customer for the lack of liquidity in the auction."

49.     As early as August 2007, Citi knew that student loan ARS, which had low maximum rate resets, comprised a significant amount of its inventory.

50.     During the fall of 2007, Citi increasingly became aware that ARS with low maximum rate resets were not "viable" instruments in the market conditions at that time because if an auction failed, a holder of these ARS would receive a below-market rate, rather than an above-market rate to compensate the holder for the illiquidity.  These ARS contributed to Citi's increasing inventory and balance sheet stress.

51.     By early December 2007, Citi was aware that certain customers were beginning to distinguish between whether the ARS had a low or high maximum rate reset. Citi began to track its inventory based upon the type of rate reset.

52.     In late December 2007, senior Citi management was provided with a draft plan in the event of failed auctions that stated:

> [I]f we are forced to fail on a specific asset type of auction rate securities, we would try to differentiate between the program structures that failed because max rates were set too low and all other program structures which can support high max rates.  It would be critical to articulate the differences between viable structures and structures that have failed.

13

Thus, "[a]ssuming sufficient balance sheet, Citi will support above market, fixed

maximum rates...remainder of market with formulaic maximum rates will not be

supported and will fail."

53.     On February 1, 2008, a research analyst at Citi issued a research report about

"Bond Insurers Impact on the Muni Market." The research report stated:

> Those [preferred ARS] with a medium or high penalty rate, those with strong
> underlying ratings, and those insured or reinsured by a strong insurer should be
> easily remarketable. Indeed, the 'bad news' of fail in these cases is offset by a
> very attractive interest rate until a successful auction is held. There are a smaller
> number of issues with a low reset rate. Even here, many of the issues are either
> backed by a strong issuer, guaranteed by a strong issuer, or in the process of being
> wrapped by a strong guarantor.
>
> While there are likely to be some more failed auctions, in our view, ultimately the
> outcome for investors should be favorable. Issuers and investment bankers have a
> strong incentive to make whole, and this can be done in the limited number of
> problem situation by a restructuring or a 'wrap' by a strong insurer.

54.     In contrast to Citi's marketing materials, this research report recognized that

certain ARS had a low maximum rate reset, but the report underestimated the number of

ARS issues that had low rate resets, the likelihood of widespread and prolonged failures,

and the impact to the holders if these ARS failed.

### Citi Knew That Auction Failures In One Segment
### Of The ARS Market Might Trigger A Chain Reaction
### Across All Segments Of The ARS Market

55.     As early as August 2007, Citi knew that fails at other broker-dealers were

impacting the ARS market, including ARS at other broker-dealers and different types of

ARS.

56.     Similarly, in December 2007, an internal document provided to senior

management stated that "if one segment of the ARS market experiences fails, there is a

high probability that investors will lose confidence in all sectors and asset types funded in

the ARS market." The documents also listed "[c]ompeting broker-dealers failing on
auctions" as one of a number of events that could force Citi to fail auctions.

### Citi Knew The Risk Of Failed Auctions
### Had Materially Increased During The Fall Of 2007

57.    A November 1, 2007 internal email from Short-Term Trading management
expressed concerns about "monolines and growing illiquidity in the ARS market." Short-
Term Trading management had reviewed "Citi's liquidity commitment to the short-term
tax-exempt market," and stated, "A change in the outlook or a downgrade on any
monoline from one of the rating agencies would hurt liquidity in the ARS market…Even
apart from the potential of a monoline downgrade, the ARS market is subject to a
potential liquidity crisis." They stated, "Since the credit crisis hit this summer, the ARS
market has been under pressure caused by investor risk aversion and other dealers' failed
auctions…As a result, liquidity has been thin. Given the difficulty of monolines… we
are very concerned that a further investor pullback could increase the risk of widespread
failed auctions."

58.    By the beginning of December 2007, Short-Term Trading management
communications discussed various scenarios under which auctions might fail. In
addition, Risk Management was conducting scenario analyses to evaluate the impact of
failed auctions.

59.    A December 7, 2007 email stated that senior Citi officials "don't have much of a
problem of letting them [ARS] go if times get much tougher."

60.    On December 15, 2007, internal emails discussed subordinate student loans,
which were a significant portion of Citi's inventory, and Citi potentially allowing those
auctions to fail when certain maximum loss or balance sheet limits were reached. One

15

email stated, "Of course if they [the subs] go, everything will probably go as well. There may be an outside chance of the subs failing and talking the market into it being a specific credit issue like what has already happened with the CDO paper." Citi was aware that if certain auctions failed, other auctions also likely would fail unless investors could be convinced that the fails related to credit risks with certain ARS, which is what happened when certain ARS backed by CDO's failed in August 2007.

61.     In mid-December, senior management had further discussions about the ramifications if Citi stopped supporting auctions. The handout for one such discussion stated, "If it survives at all, the ARS market will be much smaller in the future and will be primarily tax-exempt issuers." By December 24, 2007, an internal Citi document provided to senior management about the ARS market discussed Citi's current goals and objectives and its plan in the event of failed auctions.

62.     Citi's plan in the event of failed auctions stated:

> A specific asset class in the ARS market may become so stressed that Citi may decide to no longer support that asset class, causing failed auctions. Should this occur, Citi will continue to attempt to support the programs that are viable. However, if a specific ARS asset class experience fails, there is a high probability that investors will lose confidence in all sectors and asset types funded in the ARS market.

63.     According to the plan, "[o]n the day that auctions begin to fail, we would immediately alert the market through Citi's public relations." The public statement would state that "[u]ntil conditions improve, these 'failed auctions' will most likely continue to occur."

64.     In the cover email to the December 24, 2007 document, a senior official stated that a failed auction at Citi "seems like an unavoidable eventuality."

16

**If Customers Knew About the Increased Liquidity Risk,
Many Likely Would Sell Their ARS**

65.     Citi was aware from recent events that liquidity issues in the ARS market tended to increase customers' sales of ARS.

66.     In 2004, customer interest in ARS diminished during the Commission's investigation into broker-dealers' practice in connection with ARS securities. Similarly, in 2005, many public companies sold their ARS after accounting guidance was issued relating to the classification of ARS in the books and records of a public company as a "cash equivalent." The guidance indicated that this classification likely was not appropriate in many circumstances because the securities did not have guaranteed liquidity, and that companies may need to reclassify such securities as long-term investments because these instruments typically had long-term maturities. In both market events, Citi had to increase its support of ARS until the dislocation subsided.

67.     As early as August 2007, Citi documents discussed its support of ARS, including its support of ARS during these other crises.

68.     Thus, in late 2007 and early 2008, Citi was aware that if it disclosed to FAs and customers, or if customers learned of, the increased liquidity risk, many of these customers likely would have sold their ARS. Accordingly, on an ongoing basis, Citi noted the awareness FAs and retail customers had about ARS and the market.

**Final Events Leading Up To Citi's Decision To Allow Auctions To Fail**

69.     On February 7, 2008, another broker-dealer was the first broker-dealer to allow multiple ARS auctions to fail. A Citi ARS trader provided the following market color, "Panic is now clearly evident with both retail and institutional customers. Pricing is very erratic as dealers attempt to find a new buying base for ARS."

17

70.    That weekend, Citi assessed whether it would continue supporting the ARS

market. On February 9, 2008, a senior Citi official emailed other senior officials:

> I believe that we should allow market dynamics to determine the pricing and
> success/failure of these auctions [student loans]. If we do so, I'd expect them to
> fail. There's another factor we need to consider/ We're beginning to hear from
> investors that they're taking dealers like GS, Leh, and JPM off of their "approved"
> list (due to their allowing auctions to fail) and will begin to migrate money into
> our auctions. We do not want to indirectly encourage this inflow. This is a
> market problem and we don't want to imply that we're somehow immune from
> this situation. Allowing fails (if indeed they will) in Monday's student loan
> auctions will help highlight this.

Another senior official replied:

> I agree. It's time to let the market itself try to correct the supply/demand
> imbalances we are experiencing. Given that we don't want to encourage investors
> to migrate to our auctions on the presumption that ours are not at risk of failure,
> we may want to think about releasing our statement Monday morning.

71.    On February 11, 2008, Citi stopped supporting its student loan ARS, and all of

those auctions failed. On February 12, 2008, Citi stopped supporting ARS with low,

formulaic maximum rates, and all of those auctions failed. Thereafter, Citi allowed other

Citi-managed auctions to fail.

72.    Citi's failed auctions, and the resulting market freeze, left customers holding

billions of dollars of illiquid ARS, and many of those customers still hold those illiquid

securities.

## CLAIM FOR RELIEF

### [Violation of Section 15(c) of the Exchange Act].

73.    Paragraphs 1 - 72 are realleged and incorporated by reference as if set forth fully

herein.

74.    The Defendant made use of the mails or means or instrumentalities of interstate

commerce to effect transactions in, or to induce or attempt to induce the purchase or sale

18

of, securities: (a) by means of a manipulative, deceptive, or other fraudulent device or contrivance, and (b) in connection with which Defendant engaged in a fraudulent, deceptive, or manipulative act or practice.

75.     By engaging in the foregoing conduct, the Defendant violated Section 15(c) of the Exchange Act [15 U.S.C. §78o(c)].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court:

A.     Permanently enjoin the Defendant and its respective agents, servants, employees, attorneys, assigns and all those persons in active concert or participation with it who receive actual notice of the injunction by personal service or otherwise, from directly or indirectly engaging in violations of Section 15(c) of the Exchange Act [15 U.S.C. §78o(c)];

B.     Order the Defendant to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]; and

C.     Grant such other and further relief as this Court deems necessary and appropriate under the circumstances.

Respectfully submitted,

Robert B. Blackburn (RB 1545)

Jordan A. Thomas

Securities and Exchange Commission
3 World Financial Center, Room 4300
New York, New York  10281-1022
(212) 336-1050 [Blackburn]
(212) 336-3317 [FAC]
BlackburnR@sec.gov

Fredric Firestone
Kenneth Lench
Andrew Sporkin
Melissa Lamb
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549-4030
(202) 551-4475 [Thomas]
(202) 772-9245 [Thomas FAX]
ThomasJA@sec.gov

Attorneys for Plaintiff

Dated: December 11, 2008

20

**UNITED STATES OF AMERICA**
**Before the**
**SECURITIES AND EXCHANGE COMMISSION**

SECURITIES ACT OF 1933
Release No. 8684 / May 31, 2006

SECURITIES EXCHANGE ACT OF 1934
Release No. 53888 / May 31, 2006

ADMINISTRATIVE PROCEEDING
File No. 3-12310

| | |
|---|---|
| In the Matter of<br><br>BEAR, STEARNS & CO. INC.; CITIGROUP GLOBAL MARKETS, INC.; GOLDMAN, SACHS & CO.; J.P. MORGAN SECURITIES, INC.; LEHMAN BROTHERS INC.; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MORGAN STANLEY & CO. INCORPORATED AND MORGAN STANLEY DW INC.; RBC DAIN RAUSCHER INC.; BANC OF AMERICA SECURITIES LLC; A.G. EDWARDS & SONS, INC.; MORGAN KEEGAN & COMPANY, INC.; PIPER JAFFRAY & CO.; SUNTRUST CAPITAL MARKETS INC.; AND WACHOVIA CAPITAL MARKETS, LLC,<br><br>         **Respondents.** | ORDER INSTITUTING ADMINISTRATIVE AND CEASE-AND-DESIST PROCEEDINGS, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 15(b) OF THE SECURITIES EXCHANGE ACT OF 1934 |

**I.**

The Securities and Exchange Commission ("Commission") deems it appropriate and in the public interest that public administrative and cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 15(b) of the Securities Exchange Act of 1934 ("Exchange Act") against Bear, Stearns & Co. Inc.; Citigroup Global Markets, Inc.; Goldman, Sachs & Co.; J.P. Morgan Securities, Inc.; Lehman Brothers Inc.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; Morgan Stanley & Co. Incorporated and Morgan Stanley DW Inc.; RBC Dain Rauscher Inc.; Banc of America Securities LLC; A.G. Edwards & Sons, Inc.; Morgan Keegan & Company, Inc.; Piper Jaffray & Co.; SunTrust Capital Markets Inc.; and Wachovia Capital Markets, LLC ("Respondents").

**II.**

In anticipation of the institution of these proceedings, Respondents have submitted Offers of Settlement ("Offers") which the Commission has determined to accept.  Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, Respondents consent to the entry of this Order Instituting Administrative and Cease-and-Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934 ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondents' Offers, the Commission finds that:[1]

**A.      RESPONDENTS**

Respondent **Bear, Stearns & Co. Inc.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Citigroup Global Markets, Inc.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Goldman, Sachs & Co.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **J.P. Morgan Securities, Inc.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Lehman Brothers Inc.**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Merrill Lynch, Pierce, Fenner & Smith Incorporated**, headquartered in New York, New York, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

---

[1] The findings herein are made pursuant to Respondents' Offers of Settlement and are not binding on any other person or entity in this or any other proceeding.

Respondents **Morgan Stanley & Co. Incorporated and Morgan Stanley DW Inc. ("Morgan Stanley")**, headquartered in New York, New York, are both broker-dealers registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **RBC Dain Rauscher Inc.**, headquartered in Minneapolis, Minnesota, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Banc of America Securities LLC**, headquartered in Charlotte, North Carolina, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **A.G. Edwards & Sons Inc.**, headquartered in St. Louis, Missouri, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Morgan Keegan & Company, Inc.**, headquartered in Memphis, Tennessee, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Piper Jaffray & Co.**, headquartered in Minneapolis, Minnesota, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **SunTrust Capital Markets Inc.**, headquartered in Atlanta, Georgia, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

Respondent **Wachovia Capital Markets LLC,** headquartered in Charlotte, North Carolina, is a broker-dealer registered with the Commission pursuant to Section 15(b) of the Exchange Act.

**B.    SUMMARY**

As part of their broker-dealer businesses, Respondents underwrite, and manage auctions for, auction rate securities.[2]  From at least January 1, 2003 through June 30, 2004, in connection with certain auctions, each Respondent engaged in one or more of the practices described in Section III.C.2 below, each of which violates Section 17(a)(2) of the Securities Act.  Accordingly, each Respondent violated that provision.

**C.    FACTS**

1.    The Auction Rate Securities Market

Auction rate securities are municipal bonds, corporate bonds, and preferred stocks with interest rates or dividend yields that are periodically re-set through auctions, typically every 7, 14, 28, or 35 days.  Auction rate bonds are usually issued with maturities of 30 years, but the maturities can range from 5 years to perpetuity.  Respondents often market auction rate securities

---

[2] One entity of Morgan Stanley, Morgan Stanley DW Inc., has not underwritten auction rate securities since January 1, 2003.

to issuers as an alternative variable rate financing vehicle, and to investors as an alternative to money market funds.  Auction rate securities were first developed in 1984, and the auction rate securities market has grown to well over $200 billion.  Mostly institutional investors participate in the auction rate securities markets, although recently smaller investors also have begun participating in the market.  Typically, the minimum investment is $25,000.

> a.  Auction Mechanics.  Auction rate securities are auctioned at par so the return on the investment to the investor and the cost of financing to the issuer between auction dates is determined by the interest rate or dividend yield set through the auctions.[3]  According to the disclosure documents (the prospectus or official statement) for each security, the interest rate or dividend yield is set through an auction (commonly referred to as a "Dutch" auction) in which bids with successively higher rates are accepted until all of the securities in the auction are sold. Investors can only submit the following types of orders: 1) a "hold" order, which is the default order for current investors (i.e., the order that is entered for a current holder if the holder takes no action), where a current investor will keep the securities at the rate at which the auction clears; 2) a "hold-at-rate" bid, where a current investor will only keep the securities if the clearing rate is at or above the specified rate; 3) a "sell" order, where a current investor will sell the securities regardless of the clearing rate; or 4) a "buy" bid, where a prospective investor, or a current investor who wants more securities, will buy securities if the clearing rate is at or above the specified rate. Disclosure documents often state that an investor's order is an irrevocable offer.

The final rate at which all of the securities are sold is the "clearing rate" that applies to all of the securities in the auction until the next auction.  Bids with the lowest rate and then successively higher rates are accepted until all of the sell orders are filled.  The clearing rate is the lowest rate bid sufficient to cover all of the securities for sale in the auction.[4]  If there are not enough bids to cover the securities for sale, then the auction fails, the issuer pays an above-market rate set by a pre-determined formula described in the disclosure documents, and all of the current holders continue to hold the securities, with minor exceptions.  If all of the current holders of the security elect to hold their positions without bidding a particular rate, then the clearing rate is the all-hold rate, a below-market rate set by a formula described in the disclosure documents.

> b.  Broker-Dealers' Role in Auctions.  The issuer of each security selects one or more broker-dealers to underwrite the offering and/or manage the auction process. Investors can only submit orders through the selected broker-dealers.  The issuer pays an annualized fee to each broker-dealer engaged to manage an auction (typically 25 basis points for

---

[3] Between auctions, investors might be able to buy or sell auction rate securities in the secondary market at prices greater than, equal to, or less than par.

[4] For example, suppose $100,000 of securities were for sale and the auction received four buy bids.  Bid A was for $50,000 at 1.10%, Bid B was for $50,000 at 1.15%, Bid C was for $50,000 at 1.15%, and Bid D was for $25,000 at 1.20%.  Under these circumstances, the "clearing rate" would be 1.15%, meaning all of the securities in the auction would pay interest at a rate of 1.15% until the next auction.  Bid A would be allocated $50,000, Bids B and C would receive pro-rata allocations ($25,000 each), and Bid D would receive no allocation.

the par value of the securities that it manages).  The issuer also selects an auction agent to collect the orders and determine the clearing rate for the auction.

Investors must submit orders for an auction to the broker-dealer by a specified time.  Many broker-dealers have an internal deadline by which investors must submit their orders to the broker-dealer.  This internal deadline allows the broker-dealer sufficient time to process and submit the orders to the auction agent.  Other broker-dealers allow investors to submit orders up until the submission deadline, i.e., the deadline for broker-dealers to submit orders to the auction agent.  The broker-dealers must submit the orders to the auction agent before the submission deadline, and usually must identify each separate order.

        c.     <u>Auction Agents' Role in Auctions</u>.  After receiving the orders from the broker-dealers, the auction agent calculates the clearing rate that will apply until the next auction.  In practice, however, if there is only one broker-dealer, the broker-dealer can discern the clearing rate before submitting the orders to the auction agent.

The auction agent allocates the securities to the broker-dealers based on the orders they submitted.  The auction procedures generally state that orders are filled in the following order: hold orders, hold-at-rate and buy bids with a rate below the clearing rate, hold-at-rate orders with a rate at the clearing rate, and buy bids with a rate at the clearing rate.  When there are more bids for securities at the clearing rate than securities remaining for sale, the securities are allocated on a pro rata basis first to the hold-at-rate bidders and then to the buy bidders.  Generally, the auction procedures require broker-dealers to follow the same hierarchy in allocating the securities to their customers.

        d.     <u>Disclosures Regarding Broker-Dealer Bidding</u>.  During the relevant period, the disclosure documents for different securities varied as to what, if anything, they disclosed about broker-dealers bidding in auctions that they were managing.  Some disclosure documents did not disclose anything about bidding by broker-dealers.  Other disclosure documents disclosed that broker-dealers may bid in auctions with language similar to the following: "[a] broker-dealer may submit orders in Auctions for its own accounts."  Still other disclosure documents disclosed that broker-dealers may bid in auctions and may have an information advantage with language similar to the following:  "[a] Broker-Dealer may submit orders in Auctions for its own accounts.  Any Broker-Dealer submitting an order for its own account in any Auction might have an advantage over other bidders in that it would have knowledge of other orders placed through it for that Auction (but it would not have knowledge of orders submitted by other Broker-Dealers, if any)."

     2.     <u>Respondents' Conduct</u>

Each Respondent engaged in one or more of the following violative practices in connection with certain auctions:

        a.     <u>Completion of Open or Market Bids.</u>  Some investors placed open bids and/or market bids in auctions.  When an investor placed an open bid, it allowed the

Respondent to designate some or all of the bid's parameters, such as the specific security, rate, or quantity. When an investor placed a market bid, it indicated that it would buy at whatever rate was set during an auction. After viewing other orders in the auction, certain Respondents supplied the bid parameters missing from open bids and/or the rate for market bids. In certain instances, these practices advantaged the investors submitting open bids or market bids by displacing other investors' bids and/or affected the clearing rate.[5]

        b.    <u>Intervention in Auctions.</u>  Certain Respondents intervened in auctions by bidding for their proprietary accounts or asking customers to make or change orders without adequate disclosures.[6]  In certain instances, the interventions affected the clearing rate. Certain Respondents intervened in one or more of the following three ways:

        *b.1*    *<u>Bids To Prevent Failed Auctions.</u>*  Without adequate disclosure, certain Respondents bid to prevent auctions from failing. Failed auctions occur when there are more securities for sale than there are bids for securities and result in an above-market rate described in the disclosure documents. These Respondents submitted bids to ensure that all of the securities would be purchased to avoid failed auctions and thereby, in certain instances, affected the clearing rate;

        *b.2*    *<u>Bids To Set a "Market" Rate.</u>*  Without adequate disclosure, certain Respondents submitted bids or asked investors to change their bids so that auctions cleared at rates that these Respondents considered to be appropriate "market" rates. In certain instances, this practice affected the clearing rate and/or the Respondents' or investors' bids displaced other investors' bids; and

        *b.3*    *<u>Bids To Prevent All-Hold Auctions.</u>*  Without adequate disclosure, certain Respondents submitted bids or asked investors to submit bids to prevent the all-hold rate, which is the below-market rate set when all current holders want to hold their positions so that there are no securities for sale in the auction. Sometimes certain Respondents did not have any or sufficient inventory to be eligible to submit the hold-at-rate bids they submitted, or changed an investor's bid without obtaining permission. In certain instances, this practice affected the clearing rate;

---

[5] The clearing rate determines the interest rate or yield the issuer must pay to investors until the next auction. In those instances when these practices or any of the practices described in this Order lowered the clearing rate, investors received a lower rate of return on their investments. Conversely, in those instances when the practices raised the clearing rate, issuers had to pay a higher interest rate or yield. To the extent that certain practices affected the clearing rate, investors may not have been aware of the liquidity and credit risks associated with certain securities.

[6] This Order does not prohibit broker-dealers from bidding for their proprietary accounts when properly disclosed.

c.    Prioritization of Bids.  Before submitting bids to the auction agent, certain Respondents changed or "prioritized" their customers' bids to increase the likelihood that the bids would be filled.  As a result of this prioritization and a similar practice known as "cross-trading," certain bids were moved up in the disclosed hierarchy by which different types of bids would be filled.[7]  In certain instances, these practices resulted in certain investors' bids displacing other investors' bids when the auction was oversubscribed, affected the clearing rate, and did not conform to disclosed procedures;

d.    Submission or Revision of Bids After Deadlines.  Most auctions had an internal deadline that broker-dealers set for investors to submit bids to the broker-dealers and a formal submission deadline set by the offering documents for broker-dealers to submit bids to the auction agent.  Certain Respondents at times allowed certain investors to submit or revise bids after these deadlines.  In addition, certain Respondents themselves submitted or revised bids after these deadlines.  In certain instances, these practices, except when solely done to correct clerical errors, advantaged investors or Respondents who bid after a deadline by displacing other investors' bids, affected the clearing rate, and did not conform to disclosed procedures;

e.    Allocation of Securities.  Certain Respondents exercised discretion in allocating securities to investors who bid at the clearing rate instead of allocating the securities pro rata as stated in the disclosure documents.  In certain instances, this practice displaced other investors' bids and did not conform to disclosed procedures;

f.    Partial Orders.  When an auction is oversubscribed, investors may receive a partial, pro rata allocation of securities rather than receiving the full amount of the securities for which they bid.  When this occurred, certain Respondents did not require certain investors to follow through with the purchase of the securities even though the bids were supposed to be irrevocable.  Knowing that they would not have to follow through in purchasing partial orders, some investors bid to try to obtain the securities at rates higher than they would have bid if they had known that they risked having to buy partial orders.  In certain instances, this practice affected the clearing rate and did not conform to disclosed procedures;

g.    Express or Tacit Understandings To Provide Higher Returns.  Based upon an express or tacit understanding reached prior to or during an auction, certain Respondents provided higher returns than the auction clearing rate to certain investors.  For example, pursuant to an express or tacit understanding reached prior to or during an auction: (1) certain Respondents

---

[7] One example of prioritization occurred when certain Respondents received a sell order from one customer and a buy order from another customer in the same auction.  Rather than submitting each order to the auction agent as required by the disclosure documents, certain Respondents instead netted those orders before submitting them to the auction agent.  Cross-trading occurred when certain Respondents actually transferred securities from a customer that wanted to sell to a customer that wanted to buy, rather than submitting the bids in the auction.  Pursuant to both practices, these customers that wanted to buy securities were considered to be existing holders so that their orders had a higher priority in the auction than other new customers' bids for securities.

provided a higher return by having the investor submit its bid at a lower rate than the investor actually wanted to receive, allowing the auction to clear at the lower rate, buying the securities from the investor after the auction, and then selling the securities back to the investor at below par value; (2) certain Respondents simply displaced an investor's bid and then compensated the investor by selling securities to the investor at below par value in the secondary market; and (3) certain Respondents provided a higher return by delaying the settlement date for certain investors. In certain instances, these practices affected the clearing rate and did not conform to disclosed procedures; and

        h.     Price Talk.  Certain Respondents provided different "price talk"[8] to certain investors.  In certain instances, some investors received information that gave them an advantage in determining what rate to bid, thereby displacing other investors' bids and/or affecting the clearing rate.

## D.    LEGAL SECTION

Section 17(a)(2) of the Securities Act prohibits material misstatements and omissions in any offer or sale of securities.  Negligent conduct can violate Section 17(a)(2).  See, e.g., SEC v. Hughes Capital Corp., 124 F.3d 449, 453 (3d Cir. 1997).  Each Respondent violated Section 17(a)(2) by engaging in one or more of the practices described in Section III.C.2 above.  As a result, Respondents willfully[9] violated Section 17(a)(2) of the Securities Act.

## E.    STRUCTURE OF THE SETTLEMENT

In determining the structure of the settlement and the size of the penalties in this matter, the Commission considered the amount of investor harm and the Respondents' conduct in the investigation to be factors that mitigated the serious and widespread nature of the violative conduct.  In particular, the Respondents voluntarily disclosed the practices they engaged in to the Commission staff, upon the staff's request for information, which allowed the Commission to conserve resources.  The Commission aims to promote similar voluntary disclosures in industry-wide investigations in the future and to encourage firms to provide comprehensive information to the staff in such investigations.  The Commission believes that, after taking into account the factors described above, as well as the importance of deterring future violations of the securities laws, this settlement is appropriate.

---

[8] Price talk is a broker-dealer's estimate of the likely range within which an auction will clear. Often this range is 5-10 basis points.  Some broker-dealers update the price talk as auctions progress.

[9] "Willfully" as used in this Order means intentionally committing the act which constitutes the violation, see Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000); Tager v. SEC, 344 F.2d 5, 8 (2d Cir. 1965).  There is no requirement that the actor also be aware that he is violating one of the Rules or Acts.

For purposes of this settlement, Respondents are divided into two tiers for civil money penalty purposes based on their respective market share and conduct during the relevant period. Tier One consists of the following firms, each of which had a relatively large share of the auction rate securities market and engaged in more types of violative practices than the firms in Tier Two: Bear Stearns, Citigroup Global Markets, Goldman Sachs, J.P. Morgan Securities, Lehman Brothers, Merrill Lynch, Morgan Stanley, RBC Dain Rauscher, and Banc of America Securities. While all Respondents cooperated with the Commission, Banc of America Securities will be assessed a lesser civil monetary penalty because of the quality of its self-monitoring capabilities in the auction rate securities area that it demonstrated to the Commission staff.  Tier Two consists of the following firms, each of which had a relatively small share of the auction rate securities market and engaged in fewer types of violative practices than the firms in Tier One: A.G. Edwards, Morgan Keegan, Piper Jaffray, SunTrust Capital Markets, and Wachovia Capital Markets.

## F.  RESPONDENTS' REMEDIAL ACTS AND COOPERATION

In determining to accept the Offers, the Commission considered the remedial acts promptly undertaken by the Respondents and the cooperation afforded the Commission staff.

## IV.

In view of the foregoing, the Commission deems it appropriate, and in the public interest, to impose the sanctions agreed to in Respondents' Offers.

Accordingly, pursuant to Section 8A of the Securities Act and Section 15(b) of the Exchange Act, it is hereby ORDERED that:

A.  Respondents Bear Stearns, Citigroup Global Markets, Goldman Sachs, J.P. Morgan Securities, Lehman Brothers, Merrill Lynch, Morgan Stanley, and RBC Dain Rauscher each:

   1.  Be, and hereby is, censured;

   2.  Shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act; and

   3.  Shall, within 10 days of the entry of this Order, pay a civil money penalty of $1,500,000 to the United States Treasury;

B.  Respondent Banc of America Securities:

   1.  Be, and hereby is, censured;

   2.  Shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act; and

  3.  Shall, within 10 days of the entry of this Order, pay a civil money penalty of $750,000 to the United States Treasury;

C.  Respondents A.G. Edwards, Morgan Keegan, Piper Jaffray, SunTrust Capital Markets, and Wachovia Capital Markets each:

  1.  Be, and hereby is, censured;

  2.  Shall cease and desist from committing or causing any violations and any future violations of Section 17(a)(2) of the Securities Act; and

  3.  Shall, within 10 days of the entry of this Order, pay a civil money penalty of $125,000 to the United States Treasury;

D.  Payments of such civil money penalties shall be: (A) made by United States postal money order, certified check, bank cashier's check or bank money order; (B) made payable to the Securities and Exchange Commission; (C) hand-delivered or mailed to the Office of Financial Management, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, VA 22312; and (D) submitted under cover letter that identifies the Respondent in these proceedings, the file number of these proceedings, a copy of which cover letter and money order or check shall be sent to Kenneth R. Lench, Division of Enforcement, Securities and Exchange Commission, 100 F Street N.E., Washington, D.C. 20549-8549.

E.  Not later than 6 months after the entry of this Order, each Respondent shall provide all of its customers who hold auction rate securities ("Holders") and the issuers of such securities ("Issuers") with a written description of the Respondent's material auction practices and procedures.  In addition, commencing not later than 6 months after the entry of this Order, each Respondent shall, at or before the completion of the applicable transaction, provide all customers who are first-time purchasers, and all broker-dealers who are purchasers, of auction rate securities from the Respondent ("Purchasers") with a written description of the Respondent's material auction practices and procedures.  A Respondent may fulfill the foregoing requirements to provide such written description to Holders and Purchasers by sending a written notification (e.g., via e-mail, subject to applicable legal requirements) or, with respect to Purchasers, by including a written notification with the trade confirmation, that a written description of the Respondent's material auction practices and procedures is available on a specified web page of the Respondent's website accessible to such Holders and Purchasers.  Such written notification must be set forth prominently in such a manner as to call it to the attention of the reader and also state that a written description of the Respondent's material auction practices and procedures will be sent to the Holder or Purchaser upon request.  In addition, not later than 6 months after the entry of this Order, each Respondent shall send a written description of the Respondent's material auction practices and procedures accompanied by a list of all auction rate

10

securities for which the Respondent serves as broker-dealer (including related CUSIP numbers) to each Nationally Recognized Municipal Securities Information Repository ("NRMSIR") and appropriate State Information Depository ("SID"), if any.  Respondents may use the facilities of DisclosureUSA for such purpose with respect to auction rate securities that are municipal securities.

Furthermore, commencing not later than 3 months after the entry of this Order, each Respondent shall at all times make a description of its then-current material auction practices and procedures available to (1) all customers and broker-dealers who are participating through such Respondent in an auction of auction rate securities on the portion of its website that is accessible to such customers and broker-dealers and is related to such auction and (2) the general public on another portion of its website accessible to the general public.

As used in this Section, "auction rate securities" means, with respect to a Respondent, auction rate securities sold in auctions managed by such Respondent.

F.      Not later than 6 months after the date of this Order, unless otherwise extended by the staff of the Commission for good cause shown, each Respondent's chief executive officer or general counsel shall certify in writing to the staff of the Commission that Respondent has implemented procedures that are reasonably designed to prevent and detect failures by Respondent to conduct the auction process in accordance with the auction procedures disclosed in the disclosure documents and any supplemental disclosures and that the Respondent is in compliance with Section IV.E. of this Order.

By the Commission.


                        Nancy M. Morris
                        Secretary

11

**Exhibit C**

**Partial List of Litigation and Governmental
Proceedings Against Merrill Lynch Related to ARS**

| Matter Name | Jurisdiction | Summary of Claims | Damages Sought |
|---|---|---|---|
| *Burton v. Merrill Lynch Corp., et al.*, 08-cv-3037 (LAP) | S.D.N.Y. | On behalf of ARS purchasers under Sections 10(b) and 20(a) of the Securities Exchange Act | on behalf of "holders of more than **$300 billion**" in ARS |
| *Stanton v. Merrill Lynch & Co., Inc., et al.*, No. 08-cv-3054 (LAP) | S.D.N.Y. | On behalf of ARS purchasers under Sections 10(b) and 20(a) of the Securities Exchange Act | Rescission of "**billions of dollars** in ARS transactions . . . executed during the Class Period and to recover compensatory and punitive damages on behalf of the Class" |
| *In re Merrill Lynch Auction Rate Securities Litigation*, No. 08-cv-3037 (LAP) | S.D.N.Y. | Master file for auction rate securities class actions | Varies |
| *Louisiana Sheriffs Pension and Relief Fund, et al. v. Conway, et al.*, No. 08650364 | N.Y. Supreme | Securities class action on behalf of purchasers of bonds and preferred stock pursuant to a shelf registration which "failed to disclose that the Company . . . was responsible for significant liability arising out of its participation in the market for auction rate securities" | on behalf of purchasers of **$32 billion** of ARS |
| *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.* | SEC Enforcement Division | Repurchase and remediation | Preliminary settlement in principle for Merrill to repurchase **$7 billion** in ARS |

| *In re Merrill Lynch & Co., Inc.* | New York Attorney General | Repurchase and remediation | Settlement requiring Merrill Lynch to repurchase approximately **$12 billion** in ARS, and pay **$125 million** penalty |
|---|---|---|---|
| *In re Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 2008-0058 | Massachusetts Secretary of the Commonwealth, Securities Division | Repurchase and remediation | Settlement requiring Merrill Lynch to repurchase approximately **$12 billion** in ARS, and pay **$125 million** penalty |
| *In re Merrill Lynch & Co., Inc.* | Texas State Securities Board | Repurchase and remediation | Settlement requiring Merrill Lynch to repurchase approximately **$12 billion** in ARS, and pay **$125 million** penalty |